[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 6, 2003
THOMAS K. KAHN
CLERK

No. 00-15828

D. C. Docket No. 00-00213-CR-J-S

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

ALBERT JORDAN,
JIMMY WOODWARD,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Alabama

(January 6, 2003)

Before TJOFLAT, BARKETT and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

During the trial of this criminal case, while the Government was putting on its case in chief, the district court dismissed the indictment with prejudice on the

ground of prosecutorial misconduct. According to the court, the prosecutor's withholding and/or untimely production of evidence and other material discoverable under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and the *Jencks Act*, 18 U.S.C. § 3500, denied the defendants rights guaranteed them by the Fifth and Sixth Amendments. After a thorough examination of the record, we conclude that the court misapplied the rules established by Brady, Giglio, and the *Jencks Act* and that the prosecutor did nothing that justified the dismissal of the indictment, let alone the imposition of any other sanction. Because the court's dispositive action resulted from an erroneous application of the law, the action constituted an abuse of discretion, requiring that we vacate the judgment of dismissal and remand the case for further proceedings.

## I.

### A.

In November 1998, Jimmy Woodward was the incumbent Sheriff of Jefferson County, Alabama. The two largest cities in Jefferson County are Birmingham and Bessemer. Woodward, a Republican, ran for reelection on

November 3, 1998, but lost by 37 votes out of the 212,000 votes cast.[1] Woodward's opponent, Mike Hale, a Democrat, was certified the winner.

Woodward planned to challenge the election results, and, on November 4, secured the services of Albert Jordan, an attorney who specialized in election cases. Woodward hoped to obtain a vote recount, so Jordan at first went to work seeking a recount in several Alabama courts. Jordan failed to obtain a vote recount, however, so he filed an election contest in the Jefferson County Circuit Court on November 24, 2000, alleging, among other things, that convicted felons had voted in violation of Alabama law. See Ala. Const. of 1901, art. VIII, § 182.

On the day Woodward hired Jordan, Woodward telephoned Assistant Sheriff Royce Fields, who served under Woodward as the head of the Bessemer branch of the Jefferson County Sheriff's Department (JCSD), and informed him that he had decided to conduct a voter fraud investigation. The investigation began with the running of computer checks on the names of those in Bessemer who voted by absentee ballot to determine whether any convicted felons voted.[2]

---

[1] On November 5, 1999, the Alabama Supreme Court ruled, in a per curiam opinion, that Woodward won the election because 115 absentee votes were not properly counted. With the 115 votes counted, the court decided that Woodward won the election by 13 votes. See Eubanks v. Hale, 752 So.2d 1113 (Ala. 1999). Woodward currently serves as the Sheriff of Jefferson County.

[2] According to newspaper accounts, 3,578 of the votes cast in the November 3 election were cast by absentee ballot, with over 1,000 absentee votes from Bessemer. These newspaper accounts stated that the Bessemer absentee votes were Democratic by a margin of approximately

The computer checks were conducted through the Alabama Criminal Justice

Information System (ACJIS), which is connected to a system that houses

nationwide criminal records, the National Crime Information Center (NCIC).[3] The

ACJIS, which is based in Montgomery, Alabama, is maintained for the use of

Alabama law enforcement personnel. The NCIC, which is based in Clarksburg,

West Virginia, is maintained by the Federal Bureau of Investigation (FBI) and is

used nationwide by police agencies. If a name is checked through the ACJIS, it is

usually automatically run through the NCIC databases as well. Access to both the

ACJIS and NCIC is circumscribed by strict rules requiring that they be utilized for

law enforcement purposes only.[4] Specifically, to access the ACJIS and NCIC,

two to one.

[3] In 1968, Congress mandated that the Department of Justice establish a nationalized system to track criminal history records and exchange such records with "the States, cities and penal and other institutions." See 28 U.S.C. § 534(a)(4) (1994). The NCIC stores records of the arrests, charges, and convictions of millions of people.

[4] Indeed, the Supreme Court has recognized a significant privacy interest in these records. See United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 771, 109 S.Ct. 1468, 1480, 103 L.Ed.2d 774 (1989) ("The privacy interest in a rap sheet is substantial. The substantial character of that interest is affected by the fact that in today's society the computer can accumulate and store information that would otherwise have surely been forgotten long before a person attains age 80, when the FBI's rap sheets are discarded.").

Our circuit has also found that NCIC records carry strong privacy interests. See United States v. Pedersen, 3 F.3d 1468, 1471 (11th Cir. 1993) ("Not only was the integrity and legitimacy of the [NCIC and Social Security Administration databases] undermined by Pedersen's offenses, but specific individuals, who were entitled to expect that the integrity of the information would be maintained by Pedersen and others in his position, suffered breaches of

4

local law enforcement agencies must agree in writing to adhere to the rules and regulations governing the NCIC, and to use the system only for legitimate law enforcement purposes.

The Government believes that Woodward and Jordan, in pursuit of Woodward's election contest, conspired illegally to use, and in fact illegally used, JCSD employees and resources to conduct computer checks on the ACJIS and NCIC to determine whether any of the Bessemer absentee voters had felony convictions.[5] The Government contends that Woodward started the voter fraud investigation as a means to conceal his use of the ACJIS and NCIC for his private purposes. Accordingly, on June 21, 2000, following a joint investigation by the Alabama Attorney General and the U.S. Attorney for the Northern District of Alabama, a Northern District of Alabama grand jury, which had been empaneled in September 1999,[6] returned the instant five-count indictment[7] against Woodward

---

their privacy.").

[5] Checks were also run on certain names on the Birmingham absentee voter list, but the Government believes that these checks were done merely to cover-up Woodward's checks of the names on the Bessemer absentee voter list.

[6] Earlier, an Alabama grand jury initially indicted Sheriff Woodward for obtaining criminal history information under false pretenses in violation of Alabama Code § 41-9-601. Concern arose, however, that the indictment was the result of political influence exerted by Bessemer Democrats. Alabama's Republican Attorney General, William Pryor, then took over and discussed the prosecution with Douglas Jones, the Democratic U.S. Attorney for the Northern District of Alabama. As a result of these discussions, Pryor and Jones decided jointly to investigate the allegations and to dismiss the state indictment.

Even so, during the time the federal grand jury was in place, defense counsel maintained that the prosecution was politically motivated by Jones. Allegations were made that Jones was improperly influencing the prosecution and that he tried to encourage improper *ex parte* communication with members of the Alabama Supreme Court, who ultimately decided the winner of the November 3, 1998 election. As a result of these allegations, which Jones maintained were false, he recused himself and the Department of Justice took over the case.

Since it was a joint investigation, Gregory Biggs, an Assistant Alabama Attorney General, was assigned to the prosecution team in this case as a Special Assistant U.S. Attorney. On October 5, 2000, a few days before the trial of this case commenced, however, the district court disqualified Biggs on the ground that he had a conflict of interest, in that the Alabama Attorney General's office had successfully defended Woodward in a civil law suit brought by a public interest organization that accused him of misusing the ACJIS/NCIC databases.

[7] Woodward and Jordan were each charged in three counts of the indictment. Count One alleged that both Woodward and Jordan conspired with each other to knowingly convert to their own use records and things of value of the United States of a value in excess of $1,000; to convey, without authority, records and things of value of the United States of a value in excess of $1,000; to receive and retain, with the intent to convert to their own use, records and things of value of the United States, of a value in excess of $1,000, knowing them to be converted; to knowingly engage in misleading conduct towards others with the intent to influence the testimony of persons in future official proceedings; and to defraud the United States, that is, use deceit, craft, trickery, overreaching and dishonest means to interfere with and impair lawful government functions, that is, the government's control of the NCIC records and the information contained therein, all in violation of 18 U.S.C. § 371.

Count Two charged that Woodward knowingly and without authority conveyed to Jordan a thing of value of the United States (the NCIC records) knowing that he had no authority to do so, in violation of 18 U.S.C. §§ 2 & 641.

Count Three charged that Jordan knowingly received and retained a thing of value of the United States (the NCIC records), knowing them to have been wrongfully converted, with the intent to convert them to his own use, in violation of 18 U.S.C. §§ 2 & 641.

Count Four charged that Jordan, through employees of the Jefferson County Sheriff's Office, intentionally accessed the NCIC computers without authorization, and thereby obtained information from a department and agency of the United States for the purpose of private financial gain and in furtherance of criminal acts, in violation of 18 U.S.C. §§ 2, 1030(a)(2), and 1030(c)(2)(B)(i)&(ii).

Finally, Count Five charged Woodward with willfully and knowingly aiding and abetting

6

and Jordan.[8]  The defendants were arraigned on July 20, 2000, and entered pleas of

not guilty.[9]  The district court scheduled their trial for Tuesday, October 10, 2000.[10]

B.

On the day the defendants were arraigned, the Government served them with

a *Discovery Notice* in anticipation of their request for discovery pursuant to Rule

16 of the Federal Rules of Criminal Procedure.  With respect to Rule 16(a)(1)(A),[11]

---

the commission of the offense described in Count 4, in violation of 18 U.S.C. § 2.

[8]  The indictment was subscribed to by Craig Donsanto, Senior Trial Attorney, U.S. Department of Justice, Criminal Division, Michael V. Rasmussen, Assistant U. S. Attorney for the Northern District of Alabama, and Greg Biggs, Assistant Alabama Attorney General acting as Special Assistant U. S. Attorney for the Northern District of Alabama.  Donsanto and Rasmussen subscribed to every pleading and memorandum the Government filed in this case. We sometimes refer to them as Craig Donsanto and Michael Rasmussen or Donsanto and Rasmussen.  Biggs made no appearance for the Government following his disqualification by the court on October 5, 2000.

[9]  David C. Johnson and Brett M. Bloomston of the Birmingham law firm of David Cromwell Johnson & Associates appeared for Woodward.  At trial, Johnson occupied the lead chair.  We sometimes refer to these two lawyers as David Johnson and Brett Bloomston or Johnson and Bloomston.  William N. Clark and Ronald J. Gault of the Birmingham law firm of Redden, Mills & Clark at Law appeared for Jordan.  With minor exception, only Clark spoke for Jordan during the pretrial and trial proceedings.  We sometimes refer to him as William Clark or Clark.

[10]  The trial was initially set for October 2, 2000, but the court rescheduled it to begin on October 10 at the defendants' request.

[11]  Rule 16(a)(1)(A) provides, in pertinent part:
> Upon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney

7

the *Discovery Notice* stated that the Government was providing defense counsel

with the following:

> Copies of a 302 interview with Woodward on March 31, 199[9], a 302
> of an interview with Jordan on February 16, 2000, a November 6,
> 1998 letter, a November 6, 1998 press release, a January 15, 1999
> letter, a January 15, 1999 press release, and a March 23, 2000 letter
> with attachments, will be made available upon request.

With respect to Rule 16(a)(1)(C),[12] the *Discovery Notice* informed defense counsel

that they could "review" at the U.S. Attorney's office and "make notes of" "grand

---

for the government; that portion of any written record containing the substance of
any relevant oral statement made by the defendant whether before or after arrest
in response to interrogation by any person then known to the defendant to be a
government agent; and recorded testimony of the defendant before an grand jury
which relates to the offense charged. The government must also disclose to the
defendant the substance of any other relevant oral statement made by the
defendant whether before or after arrest in response to interrogation by any person
then known by the defendant to be a government agent if the government intends
to use that statement at trial.

[12] Rule 16(a)(1)(C) provides:
Upon request of the defendant, the government shall permit the defendant to
inspect and copy or photograph books, papers, documents, photographs, tangible
objects, buildings or places, or copies or portions thereof, which are within the
possession, custody or control of the government, and which are material to the
preparation of the defendant's defense or are intended for use by the government
as evidence in chief at the trial, or were obtained from or belong to the defendant.

The remaining provisions of Rule 16(a)(1) are irrelevant here. Rule 16(a)(1)(B) involves
disclosure of the defendant's prior record, which neither defendant has in this case. Rule
16(a)(1)(D) provides for disclosure of reports of physical and mental examinations and tests,
none of which were taken in this case. Finally, Rule 16(a)(1)(E) provides for disclosure of
expert witness testimony. There are apparently no expert witnesses in this case.

jury transcripts and summaries of interviews,"[13] but they "w[ould] not be permitted to copy these materials."[14]  The *Discovery Notice*, in recognition of the

---

[13] The "grand jury transcripts" contained the testimony of 15 witnesses who appeared before a Northern District of Alabama grand jury.  The "summaries of interviews" included (1) FBI "302s," documents prepared by FBI agents after interviewing a witness, (2) a memorandum "to file," prepared by an FBI agent, (3) memorandums prepared by Special Agent Dupuis, the FBI's Case Agent, summarizing information he obtained from the Alabama Bureau of Investigation, (4) a letter from the Jefferson County District Attorney's office to a member of the Alabama Senate, and (5) internal memorandums prepared in the office of Sheriff Mike Hale (who defeated Woodward in the 1998 election).  In its *Discovery Notice*, the Government stated that "certain [grand jury] transcripts and/or summaries will not be made available due to fear of reprisal by one or [both] of the defendants."

[14]  The *Discovery Notice* also stated that defense counsel could obtain from the U. S. Attorney's office CD roms containing:
> 1. Documents Bates stamped C000001-C000122
> 2. Documents Bates stamped C000500-C000596
> 3. Documents Bates stamped B000001-B002180
> 4. Woodward's calendar with cover letter
> 5. Documents related to a dump truck accident
> 6. Incident/offense report and other documents related to ballot security.
> 7. Documents related to the NCIC/ACJIS system
> 8. Michel Lann's report.

In addition, the *Discovery Notice* informed counsel as follows:

> A computer printout of the ACJIS off-line search and the NCIC off-line search in 3-4 inch stacks are available for inspection at the offices of the FBI.  Counsel may arrange to review these printouts by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

> Summaries of interviews, transcripts and other documents related to voter fraud investigations by the state Attorney General, with Bates numbers 000000 through 000228 are available for inspection at the United States Attorney's office.  Counsel may arrange to review these by calling AUSA Mike Rasmussen.

> Various billing and other office records were provided to the United States by the Wallace Jordan law firm pursuant to subpoena.  The United States assumes that copies of these are already available to the defendant Jordan, and to the defendant Woodward via a joint defense agreement.  If counsel for either

9

defendant wishes to review these materials, counsel may arrange to do so by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

Various documents, described as the Sheriff's personal file, were provided to the United States by counsel for the defendant Woodward pursuant to subpoena. The United States assumes that copies of these are already available to the defendant Woodward, and to the defendant Jordan, via a joint defense agreement. If counsel for either defendant wishes to review these materials, counsel may arrange to review the same by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

Various documents were provided to the United States by Sam Robinson pursuant to subpoena.  If counsel wishes to review these materials, counsel may arrange to so by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

Various documents were provided to the United States by the Sheriff's office pursuant to subpoena, including various incident/offense reports, statement by Persall, tapes of McGuffie, Mahaffey, Thompson, Evans, Humphreys & Reed, statement of Moore, letter of Horton, miscellaneous receipts, miscellaneous absentee affidavits, entry logs, Argo case materials, Alabama Administrative Code, and rules and regulations.  If counsel for either defendant wishes to review these materials, counsel may arrange to review the same by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

Various documents including an appointment book, CFR excerpts faxed 11/18/98, I.O.  report #9807-00874, internal computer queries re complaints, a 11/17/98 run of the Bessemer Absentee List, a 10/30/98 run of the Bessemer Absentee list, are also available.  If counsel for either defendant wishes to review these materials, counsel may arrange to review the same by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

The file with the state Supreme Court has also been provided to the United States pursuant to subpoena; this includes exhibits.  If counsel wishes to review these materials, counsel may arrange to do so by calling FBI Special Agent Barry Dupuis.  If counsel wishes to copy said materials, he must bring his own copying equipment and supplies.

prosecution's constitutional obligations under <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963),[15] and <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L. Ed. 2d 104 (1982),[16] went on to state:

> If, after reviewing the [grand jury transcripts and summaries of interviews, defense] counsel believes certain documents or portions thereof contain *Brady/Giglio* information, counsel may provide a list of such materials to the prosecuting Assistant United States Attorney with a brief written statement of the reasons counsel believes they contain *Brady/Giglio* information. If the prosecutor agrees, he will provide hard copies. If the prosecutor disagrees, the defendant may move the court to review the material in camera; this office will make the materials available to the court for its review if so directed.[17]

---

The United States has transcripts of testimony in various civil cases. These are available to counsel from their own sources.

The United States has copies of Woodward's campaign filings reporting contributions and expenditures. These are available to counsel from public sources.

Record, vol. 1, no. 17, at 3-4 (paragraph letters omitted).

[15] <u>Brady</u> requires the prosecution to turn over to the defense any exculpatory evidence in its possession or control. <u>See</u> part III <u>infra</u>.

[16] <u>Giglio</u> requires the prosecution to turn over to the defense evidence in its possession or control which could impeach the credibility of an important prosecution witness. <u>See</u> part III <u>infra</u>.

[17] The Government allowed counsel to examine grand jury transcripts and the summaries investigators had prepared after interviewing witnesses notwithstanding provisions of Rule 16 and 18 U.S.C. § 3500 which preclude a court from ordering their production under Rule 16(a)(1)(C).

Rule 16(a)(2) states, in relevant part, that "[e]xcept as provided in paragraph[] (A) . . . of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case." Under Rule 16(a)(2),

11

. . .

    Agreements and use immunity orders are available [with respect to witnesses who testified before the grand jury or who had been interviewed by an investigator].

In the view of Jordan's attorney, William Clark, it was the Government's responsibility, not his, to identify the portions of the grand jury transcripts and summaries of interviews that constituted <u>Brady</u>/<u>Giglio</u> material. Accordingly, on July 27, he served the Government with a *Request for Disclosure* in which he asked that the Government identify all of the <u>Brady</u> and <u>Giglio</u> material in its possession and to make available for inspection and copying all the items discoverable under Rule 16. His *Request* went one step further, however, and

---

therefore, the interview summaries made by the government agents were exempt from discovery. <u>See</u> Notes of Advisory Committee on 1944 Amendments to Federal Rules of Criminal Procedure, Fed. R. Crim. P. Rule 16.

    Rule 16(a)(2) also states that Rule 16 does not "authorize the discovery or inspection of statements made by government witnesses or prospective government witnesses, except as provided in 18 U.S.C. § 3500." Section 3500, known as the *Jencks Act*, the substance of which was incorporated into Fed. R. Crim. P. 26.2 in 1979, provides that no statement of a government witness shall be the subject of discovery until said witness has testified on direct examination in the trial of the case. 18 U.S.C. § 3500(a). (For ease of discussion, we refer to Rule 26.2 as the *Jencks Act or Jencks*.) "Statement" is a defined term that includes grand jury transcripts. 18 U.S.C. § 3500(e)(3). Accordingly, Rule 16(a)(2) makes clear that the grand jury transcripts were not discoverable under Rule 16(a)(1)(C).

    Two additional rules support the fact that grand jury transcripts are not subject to Rule 16(a)(1)(C) discovery. First, Rule 16(a)(3), after laying out exceptions not relevant to our case, states that Rule 16 "does not relate to discovery or inspection of recorded proceedings of a grand jury." Second, Rule 6(e) generally requires that the grand jury proceedings remain secret. Although Rule 6(e) provides exceptions to secrecy, no exception is applicable to this case.

12

sought the production of materials not discoverable under Rule 16. For example, even though Rule 16(a)(2) states that internal reports and documents prepared by government agents investigating or prosecuting the case are not discoverable, counsel asked the Government to produce (1) "all notes taken by each and every federal or state agent, investigator, or employee during conversations, interviews, or investigations of this Defendant or any alleged accomplice, whether said accomplice is identified or unidentified in the indictment," and (2) "any and all correspondence between the United States of America or any agent thereof, and Alabama Attorney General Bill Pryor or any member of his staff, Jefferson County District Attorney David Barber or any member of his staff, or Bessemer District Attorney Sam Russell or any member of his staff regarding the facts contained in the indictment or any aspect of the investigation or prosecution of these Defendants during the [investigative period]." And, notwithstanding the Rule prohibitions of Rule 16(a)(3) and the *Jencks Act*, counsel also asked the Government to produce the grand jury testimony and/or statements of every witness who would be testifying at the defendants' trial.[18]

Recognizing that these requests were outside the scope of authorized

---

[18] Jordan asked for these *Jencks Act* statements in both his *Request for Disclosure* and his *First Amendment to Request for Disclosure*, which he served on the Government on July 31.

13

discovery, the Government responded, on July 31, to Jordan's *Request for Disclosure* by stating that "the government's *Discovery Notice* proffers practically all the materials and information gathered and developed in the investigation . . . [and] provides all the material the defen[se] is entitled to under the law. . . . As to the material requested but not provided, the United States either does not have, or declines to provide, [such materials]."

On July 31, Clark repeated his demand that the Government identify the Brady and Giglio material contained in the items listed in its July 20 *Discovery Notice*. In a *Motion to Compel Specific Production of Exculpatory Statements, Documents or Information* (hereinafter "*Motion to Compel Specific Production*"), he stated that because the Government had produced "such a voluminous amount of information," it would be "easy [for him] to overlook some document or statement." In his view, the Government's "production of thousands of documents which [it] ha[d] no intent on using at trial [was] really no more than a ploy to make difficult the discovery of exculpatory information."

On August 7, Clark took issue with the Government's July 31 response to his *Request for Disclosure*. Because he considered the Government's response to be woefully inadequate, Clark filed a *Motion to Compel* which sought a court order requiring the Government to respond specifically to each and every paragraph of

his *Request for Disclosure*, and to produce the documents referred to therein.

While the *Motion to Compel* was in transit, the Government prepared a response to

Jordan's July 31 *Motion to Compel Specific Production,* which it sent to Clark on

August 8.  The response stated:

> [T]he grand jury testimony of 15 witnesses have been provided.  If there are any more statements, they will be provided according to *Jencks*.  The defendants have been given practically all the evidence gathered in this investigation.  Inter office correspondence or memoranda is simply not discoverable.  It does not constitute any evidence that the defendants are guilty or not guilty or evidence that witnesses are or are not credible; to the extent that such correspondence or memoranda comments on any exculpatory evidence, that evidence has been made available.

On August 28, the Government answered Jordan's August 7 *Motion to*

*Compel*.  Using a photocopy of Clark's July 27 *Request for Disclosure*, Assistant

U.S. Attorney Michael Rasmussen handwrote a response next to every paragraph

of the document.  Once again, the Government "declined" to produce the notes the

investigators made following witness interviews.

On September 5, the magistrate judge held a hearing on several pending

motions, including Jordan's *Motion to Compel Specific Production* and *Motion to*

*Compel*.  Concluding that the first motion sought witness statements, i.e., "Jencks

materials," the judge denied the motion on September 7.  In his order, he stated that

the statements would be produced at trial, pursuant to the *Jencks Act*, after the

witnesses testified on direct examination.

As for the *Motion to Compel* more specific responses to the defense's *Request for Disclosure*, Clark, after acknowledging that the Government had permitted defense counsel to read, and make notes of, grand jury transcripts and summaries of interviews (principally 302s), asked the magistrate judge to order the Government to produce hard copies of those 302s, as well as hard copies of the "raw notes" the FBI agents made during or after the interviews and used to dictate the 302s. The Government's response was that neither the 302s nor the agents' notes were discoverable; if an agent testified about an interview, the 302 might constitute a *Jencks Act* statement of the agent (not the person interviewed) which would have to be produced at the conclusion of the agent's direct examination.[19] The magistrate judge agreed with the Government's position that the 302s and the agents' notes were not discoverable, and, on September 7 (in the same order that disposed of Jordan's *Motion to Compel Specific Production),* denied the *Motion to*

---

[19] In response to defense counsel's suggestion that since the Government had already permitted the defense to read and make notes of the grand jury testimony and the 302s, the Government ought to produce hard copies of the materials, the prosecutor said the following:

> [W]hy don't we make hard copies? Well, our office policy is we don't. And the reason we don't is because in cases in the past copies of FBI 302s and Grand Jury testimony have somehow gotten out and floated around the communities, and people have taken them and gone to witnesses and said look what we've got. . . . We don't allow that to happen anymore, and that's the reason why we let them read it.

16

*Compel*.[20]

On September 15, Jordan, joined by Woodward, filed objections to each of the magistrate judge's rulings. The district court deferred its ruling on the objections until the day of trial; at that time, the court disposed of the objections in one word, "denied."

## C.

The trial began, as scheduled, on Tuesday, October 10, 2000, with jury selection. The voir dire of the venire lasted five court days. The jury was sworn on the morning of the sixth day, Tuesday, October 17; after that, the parties made their opening statements.

Michael Rasmussen outlined the Government's case. First, he explained the ACJIS and NCIC systems, as well as the rules and regulations surrounding their use. He said that the defendants had been indicted because they developed a plan to use the ACJIS/NCIC to obtain information for a private purpose, namely, to contest the sheriff's election. As part of this plan, Woodward and Jordan decided, the day after the election, to ask Assistant Sheriff Royce Fields to run the

---

[20] The magistrate judge made the same ruling on August 21, when he denied another of Clark's July 31 motions (to wit, the *Motion . . . to Compel Production of Witness Statements and Grand Jury Testimony*) on the ground that the materials were not discoverable.

17

ACJIS/NCIC checks. Accordingly, two days later, on November 5, Jordan called Fields at home, told him that Woodward had retained him to contest the election, and instructed him to obtain the list of absentee voters from the Bessemer area so they could determine if anyone on the list was a convicted felon or deceased. After speaking to Woodward, Fields sent a deputy to the courthouse in Bessemer to retrieve the list of the absentee voters.

Once he had the list, Fields called Jordan and asked what to do next. Jordan told Fields to run criminal history checks on the names on the list, and Fields had JCSD employees, Arnetta Sayers and Charlotte Lackey, secretaries in the Bessemer office, carry out the task. When Fields informed Woodward that the project could not be done quickly, Woodward offered Fields the services of Kathy Ayers, a secretary in his Birmingham office.

The checks produced some "hits."[21] On November 9, Woodward told Fields to compile the results of the checks run to date and take them to Jordan. As instructed, Fields went to Jordan's office, accompanied by Ray Edwards, a private investigator who was working on Woodward's election contest. Fields discussed the list with Jordan, mentioning that the list contained NCIC information. Jordan

_____

[21] Rasmussen explained that a "hit" meant that the ACJIS/NCIC computer check revealed a criminal arrest.

reviewed the results, photocopied them, instructed Fields to keep running the names, and told Edwards to determine if any of the elderly people on the list were deceased.

A JCSD deputy learned that the checks were being conducted, and, shortly thereafter, the Alabama Criminal Justice Information Center (ACJIC) had one of its investigators look into the situation – to determine whether Woodward was using the ACJIS to prepare his election contest. On November 19, the ACJIC investigation became public when the *Birmingham News* published an article entitled "Officials Eye Woodward's Use of Crime Databases."

The morning the newspaper hit the newsstand, Woodward called a meeting in his Birmingham office. "Everybody" was there. Woodward told those assembled that he had decided to form a voter fraud task force, which Rasmussen suggested was a "cover up" for Woodward's improper use of the NCIC.

To buttress the cover-up and provide further proof that the ACJIS/NCIC searches were being done pursuant to an official investigation into voter fraud, Woodward spoke briefly with Jefferson County District Attorney David Barber in Birmingham.[22] Woodward told Barber that he was conducting a voter fraud

---

[22] Although Bessemer, like Birmingham, is within Jefferson County, Bessemer has its own court system and elected district attorney.

investigation and asked Barber if he could use one of his investigators to run criminal history checks. Barber gave him Carl Wideman, who happened to be the husband of Woodward's secretary, and he ran the checks through the ACJIS/NCIC. Rasmussen completed his opening statement by informing the jury of the elements of the charged offenses.

Woodward's attorney, David Johnson, went next. He told the jury that the case was all about Sheriff Woodward's investigation into the complaints of voter fraud the sheriff had received during 1998. He said that the sheriff's department had been "besieged and bombarded by voter fraud allegations" about the November 3, 1998 election, and had decided to investigate these complaints the day after the election. Because the District Attorney in Bessemer, Sam Russell, refused to investigate the allegations, Sheriff Woodward had his office launch an investigation. This is why Woodward went to the District Attorney in Birmingham, David Barber, for help.

Johnson then noted that Woodward had hired Jordan to seek a vote recount, but Jordan was forced to contest the election when his effort to obtain the recount failed. Johnson then detailed the steps Jordan took in Woodward's behalf. He remarked that although Jordan did meet with Fields on November 9, and Fields did show Jordan information regarding criminal histories, Jordan did not use that

20

information in the election contest; instead, Jordan ran his own criminal histories on a public database. Johnson closed his opening statement with the suggestion that the prosecution was politically motivated, and that Fields had turned against Woodward because he knew that the sheriff planned to fire him after the election.

After a lunch break, William Clark delivered Jordan's opening statement. He immediately rejected the notion that Jordan was implicated in any improper use of the NCIC. He acknowledged that Jordan had met with Fields in Jordan's law office on November 9, and that Fields subsequently provided him with information taken from the NCIC. Jordan, though, did not know what the NCIC was or that the use of the NCIC was restricted. To the contrary, Jordan assumed that Fields' use of the NCIC was legal. His only concern was that because the majority of voters in Bessemer were African-American, to avoid a charge of race discrimination, Fields, in running the criminal histories of the names of the absentee voters, should be careful not to single out African-Americans. Finally, in contesting the election for sheriff, Jordan did not use the NCIC information Fields had given him; instead, he used information he obtained from other sources.

Clark addressed Woodward's voter fraud investigation in this way. He disputed Rasmussen's claim that the investigation commenced the morning of November 19, after the *Birmingham News* story reported on the ACJIC

21

investigation, and said that the investigation began "almost immediately" after the polls closed on November 3. The NCIC information Fields had shared with Jordan had been gathered in pursuit of that investigation. Clark finished his opening statement by informing the jury that Fields would be testifying for the Government under a grant of use immunity.[23] Stating that Fields had "lied" during the investigation, Clark suggested the jury should give his testimony no credence.

## D.

Following the parties' opening statements, which ran until 3:00 p.m., the Government called its first witness, Sara Fields, Royce Fields' wife, to establish one point – that Jordan called her husband at home on the morning of November 5, 1998 (she answered the telephone). On cross-examination, defense counsel explored her history of depression, and got her to admit that sometimes, due to her depression, she had trouble telling the truth. At the conclusion of her testimony, the court adjourned for the day.

The next day, Wednesday, October 18, the Government called Royce Fields to the stand.[24] Fields testified that on the morning of November 5, 1998, he

---

[23] Fields was no longer employed by the JCSD; he retired on January 18, 1999.

[24] Before Fields took the witness stand, the defense informed the court that Fields and his wife had engaged in a discussion after she left the stand the previous afternoon, and they

received a phone call from Jordan during which Jordan said that Sheriff Woodward had employed him to contest the election. Jordan asked him to obtain the Bessemer absentee voter list. Fields retrieved the list the same day and called Jordan back. Jordan told him to start running criminal histories of the names on the list. Fields testified that he was "uncomfortable" running the checks without an official complaint; nevertheless, he undertook the inquiry and instructed his secretary, Arnetta Sayers, to run the names through the NCIC.

On November 9, Woodward called and asked him to bring the results of the checks to him in Birmingham. Fields complied. When he gave Woodward the information, the sheriff did not review it; instead, he directed Fields to take the results to Jordan's office. He did so, and discussed the results with Jordan. In the process, he told Jordan that the information came from the NCIC. Jordan directed him to continue running the checks.

Fields next testified that, on the morning of November 19, the *Birmingham News* ran an article stating that the ACJIC was looking into whether Sheriff Woodward had improperly used criminal databases to check the backgrounds of voters who had applied for an absentee ballot for the November 3 election. Shortly

---

suggested that her trial testimony was the subject of the discussion. Outside the presence of the jury, the court asked Fields whether that was true. Fields admitted having a discussion with his wife, but said that the subject only concerned her depression. Defense counsel nonetheless moved the court to bar Fields from testifying. The court denied the motion.

after the newspaper hit the newsstand, Woodward called a meeting at his Birmingham office. Present, in addition to Woodward, were Fields, Jordan, JCSD attorneys, and several deputies. When the meeting began, Woodward announced that he had decided to create a task force to investigate claims of voter fraud. Woodward said that rumors had been circulating to the affect that the Bessemer District Attorney (Sam Russell) was considering indicting him and Fields for their use of the NCIC in the investigation of the absentee voters. The gist of Fields' testimony about the meeting was that Woodward was creating the task force in an effort to avoid indictment. The task force would focus on voter fraud complaints that had been lodged with the Bessemer office. To that end, Woodward directed Fields to fax the complaints to him in Birmingham. Fields explained that one of the complaints had been filed by State Representative McAdory, who had been defeated in the June primary; another complaint involved an allegation that a prison inmate had voted in the City of Bessemer elections. Fields said that he had informed Woodward of these complaints when they were originally filed, but that Woodward told him to let the Bessemer District Attorney handle them. At the conclusion of his direct examination, Fields acknowledged that he had appeared

before the grand jury under a court order.[25]

Jordan's attorney, William Clark, began the cross-examination.[26] He asked Fields whether he had testified before the grand jury, and Fields said that he testified twice, first on October 28, 1999, and a second time on June 21, 2000. On October 25, three days before the first appearance, he was interviewed by Special Agent Dupuis of the FBI (the case agent), Assistant Alabama Attorney General Gregory Biggs and Special Agent Edward Hunneyman of the Alabama Attorney General's office, and Assistant U.S. Attorney Robert Posey. All four made notes of what he told them. When Fields said this, Jordan's attorney asked the court to order the Government to produce the notes. The court excused the jury, and the following colloquy ensued.

Clark spoke first. He contended that the defense was entitled to the interviewers' "raw notes" because, he represented, they contained "exculpatory information."[27] The prosecutor, Rasmussen, disagreed. Interpreting Clark's

---

[25] The order granted Fields use immunity, and was entered prior to his first appearance before the grand jury.

[26] Pursuant to the Government's *Discovery Notice*, defense counsel were allowed to review and make notes, but not copy, the transcripts of Fields' grand jury testimony. On October 18, before Fields took the witness stand, defense counsel were given copies of the transcripts.

[27] Defense counsel had not seen the raw notes because they were not made available for review pursuant to the Government's *Discovery Notice* of July 20, 2000. Clark, therefore, had no basis for representing that they contained "exculpatory" information. Although he did not use

25

request as a demand for *Jencks Act* statements,[28] Rasmussen said that the notes did not qualify as *Jencks* statements because they were not "an exact, [] verbatim rendition of what [Fields] said" during the interview. At this point, the court asked Fields if Rasmussen was present during the interview. When Fields replied that he was not, the court instructed Agent Dupuis (who was seated at the prosecutor's table) to give the defense "whatever notes were prepared of the interview." Dupuis said that he doubted that he still had his notes. Turning to Rasmussen, the court instructed him to produce all of the notes made in connection with the Fields interview on October 25. Still convinced that the notes were not *Jencks*

---

the word *Jencks* in asking the court to order their production, his position was that the *Jencks Act* required their production. The court considered Clark's request as being made pursuant to the *Jencks Act*. This becomes apparent in the ensuing court-counsel colloquy regarding (1) the raw notes, (2) the internal communication Agent Dupuis wrote to the Birmingham FBI office on November 2, 1999 (reporting on the Fields interview of October 25), (3) the handwritten notes made by Rasmussen, Posey, and Biggs (during and after the interview), and (4) the summary of interview Hunneyman prepared sometime after October 25.

[28] The *Jencks Act* provides that in criminal prosecutions brought by the United States, no statement made by a government witness may be the subject of discovery until after that witness has testified at trial. 18 U.S.C. § 3500(a), (b). "Statement" is a legal term of art under the act:
> (e) The term "statement" . . . means –
>> (1) a written statement made by [a government] witness and signed or otherwise adopted or approved by him;
>> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

statements, Rasmussen asked the court if he could read "the rule" (referring to Fed.

R. Crim. P. 26.2, which incorporates the *Jencks Act*). The court denied the request

and declared a brief recess so that Rasmussen could retrieve the notes.

When the proceedings resumed, Rasmussen gave the court Posey's notes for

en camera review. He also produced his own notes, made following a separate

meeting with Fields.[29] As for Biggs' and Hunneyman's notes, he told the court that

he had called Biggs and Hunneyman at the Alabama Attorney General's office and

left a message that the court wanted their notes. After examining Rasmussen's

and Posey's notes and redacting from the latter the part that reflected Posey's

"thought processes," the court gave both sets of notes to defense counsel, and

declared another recess.[30]

Meanwhile, Dupuis retrieved an "internal communication" he had sent to the

Birmingham FBI office on November 2, 1999, which detailed the information

Fields had provided during the interview on October 25. He gave copies of the

---

[29] The court had the clerk mark both sets of notes, as well as the other items – described in the text infra – which Rasmussen produced over the next several days, as court exhibits.

[30] With respect to Posey's notes, the court said that they contained information that was "contrary" to what Fields had said on direct examination. The court's recollection of Fields' testimony was that Fields obtained for Jordan a copy of the absentee voter list (which was received in evidence as a Government exhibit). Posey's notes, however, indicated that Fields said in the interview that Jordan already had the list. Rasmussen tried (unsuccessfully) to convince the court that there was no inconsistency – Fields was referring to the Bessemer list, when he testified (on direct examination) that he retrieved a list for Jordan; what Jordan already had was the Birmingham absentee voter list.

communication to Rasmussen, who, in light of the court's ruling that all notes were to be turned over, gave copies of the internal communication to defense counsel. As lunchtime was approaching, the court recessed until 2:00 pm.

The afternoon session began with Rasmussen producing Biggs' notes and Hunneyman's typewritten summary (dictated from Hunneyman's notes, which had been destroyed) of the Fields interview. The notes and summary were marked together as a court exhibit, and pursuant to the court's order, Rasmussen handed them to defense counsel. After receiving the exhibit, and reviewing the items previously marked as court exhibits, Clark moved the court to "dismiss the indictment . . . on the grounds of prosecutorial misconduct . . . in that they have withheld exculpatory information." Counsel focused specifically on Dupuis' "internal communication," observing that it contained "details" Fields had not furnished on direct examination and statements "directly in conflict" with Fields' testimony. Specifically, according to Clark, (1) Fields testified on direct that he obtained for Jordan an absentee voter list, whereas Dupuis' internal communication indicated that Fields obtained an "absentee voter application list"; (2) Fields testified on direct that he met Jordan on November 9, whereas the internal communication indicated that the meeting took place on November 17 or 18; (3) Fields testified on direct that Woodward's voter fraud investigation

28

commenced on November 19, after the *Birmingham News* article appeared, whereas the internal communication indicated that an investigation into voter fraud began on November 6; and (4), on direct examination, Fields said nothing about having heard rumors that Woodward was planning to replace him after the election, whereas the internal communication indicated that he had heard such rumors. When Clark finished, Woodward's attorney, Johnson, who joined in the motion to dismiss, stepped forward, pointing out (what he considered to be) an additional discrepancy between Fields' testimony on direct and Dupuis' internal communication: (in Johnson's view) Fields testified that Jordan instructed him to use the NCIC to check criminal histories,[31] but the internal communication indicated that it was not Jordan's idea to use the NCIC.[32]

Rasmussen responded to the motion to dismiss as follows. First, nothing in Dupuis' internal communication was exculpatory. And, even if the document could be viewed as exculpatory, it could not have been so until Fields testified on direct examination. Therefore, the Government had no obligation to produce the

---

[31] Counsel was mistaken; as we indicate in the text supra, Fields did not testify that it was Jordan's idea to use the NCIC.

[32] Turning to the issue of prosecutorial misconduct, Johnson said that "the Government has allowed [Fields] to perjure himself on at least three material matters": Fields committed perjury when he testified on direct (1) that Jordan instructed him to use the NCIC; (2) that the voter fraud investigation did not begin until the task force was formed on November 19, and (3) that he met with Jordan on November 9.

document until it completed Fields' direct examination. And, the argument that the Government should have produced the internal communication prior to trial was frivolous. Also frivolous was the argument that the document was exculpatory because it contained information the Government had not elicited from Fields on direct examination. Consequently, the Government's failure to produce Dupuis' internal communication could not be deemed prosecutorial misconduct.[33]

At the conclusion of Rasmussen's response, the court stated that it would not rule on the motion at that time, but required Rasmussen immediately to turn over all exculpatory documents to both the court and the defense. Clark then reiterated his argument that the Government had disregarded the requirements of Brady and Giglio by withholding exculpatory material – namely, Dupuis' internal communication. The court agreed, offering this comment (which echoed the point Johnson had stressed): "I will say this, . . . with respect to [the internal communication] . . . there is nothing in there that says that Mr. Jordan suggested that Mr. Fields use NCIC." Rasmussen, in turn, said "I agree with that, your honor. [But,] Mr. Fields didn't testify that Mr. Jordan told him to run NCIC records." The court-counsel colloquy ended shortly thereafter, and the proceedings

---

[33] For sake of brevity, we present the gist of Rasmussen's response to the motion to dismiss, which was quite lengthy and was interspersed with comments the court made while reading Dupuis' internal communication.

were adjourned for the day.

That evening, the Government delivered a considerable number of items to defense counsel and to the court. The material included three transcripts of Dupuis' testimony before the grand jury;[34] an internal communication Dupuis sent to the Birmingham FBI office on May 12, 2000, which detailed information Fields had provided him, Rasumssen and Posey on May 8, 2000; five pages of handwritten notes unidentified FBI agents made during interviews of Jordan on February 16, 2000;[35] and a letter from Craig Donsanto and Rasmussen to Woodward's and Jordan's attorneys regarding the costs of running NCIC checks.

The next morning, Thursday, October 19, the court began where it left off the previous afternoon. Rasmussen informed the court of the materials delivered to defense counsel (and the court), which included the transcripts of Dupuis's grand jury testimony. Although he remained convinced that none of the material was exculpatory, he decided to give it to defense counsel "out of an abundance of

_____

[34] These transcripts were of Dupuis' appearances before the grand jury on October 26, 1999, March 16 and 17, 2000, and April 19, 2000. Dupuis appeared before the grand jury a total of seven times. As of October 19, 2000, when Rasmussen produced the three transcripts mentioned above, the court reporter had not prepared transcripts for Dupuis' four remaining appearances, which were on December 1, 1999, and February 16, May 17, and June 21, 2000. On October 23, the court reporter prepared transcripts of the first three remaining appearances; on October 24, she prepared a transcript of the fourth (June 21, 2000). As indicated in the text infra, Rasmussen gave defense counsel copies of these four transcripts on October 24.

[35] The record does not explicitly indicate who wrote the notes. Our examination of the notes leads us to believe that they were made by Dupuis and Agent Thomas Mayhall.

31

caution." The court asked the attorneys whether they had anything further to say about the defendants' motion to dismiss the indictment. Clark spoke first. He began by stating that in providing the defense with the discovery required under Rule 16(a), the Government stated that it was producing whatever exculpatory material it had in its possession. "That," he said, "was a false statement." Next, he accused Rasmussen of not being "candid with the court," and alleged that Rasmussen and other federal officials were engaged in "a conspiracy to withhold evidence" discoverable under Rule 16, Brady, Giglio, and the *Jencks Act*. An example of withheld exculpatory evidence, he said, were the grand jury transcripts of Dupuis' testimony, which contained at least one contradiction of Fields' testimony on direct examination:[36] on direct, Fields said that he had given Jordan an absentee voter list; Dupuis, however, told the grand jury that Fields told him that he had given Jordan an absentee voter "application" list. Dupuis' testimony on this point was exculpatory, Clark insisted, and therefore should have been produced prior to trial.[37]

---

[36] Rasmussen's response to counsel's argument that the law entitled the defense to a copy of Dupuis' grand jury testimony was essentially the same as his response to counsel's argument that the Government should have produced Dupuis' internal communication of November 2, 1999, as part of its Rule 16(a) discovery: "Agent Dupuis was [only] a summary witness in the grand jury. He's not a witness to any of the events that are the subject of the case. We were not going to call him as a witness."

[37] In other words, Clark argued that (1) Rasmussen should have anticipated that Fields would refer to an absentee voter list in his trial testimony, (2) Rasmussen should have realized

32

Further evidence of the conspiracy, according to Clark, involved the FBI 302s. He reminded the court that the Government's practice in the Birmingham Division of the Northern District of Alabama had always been to "produce[] 302s in discovery and, certainly, in response to *Jencks*." He contended that in this case, though, the Government, in an effort to keep defense counsel in the dark, evidently instructed the investigating FBI agents not to prepare 302s following witness interviews; instead, "[t]hey start using interoffice memos," which are not discoverable under the *Jencks Act* or Rule 16(a). The Government, he continued, employed this strategy in dealing with Fields, a key prosecution witness. Although Dupuis interviewed him – perhaps several times – he prepared no 302s. "So, the pattern is that the FBI agent had these interoffice memos that the government responds, well, we don't have to produce interoffice memos and, even if we did, they're not exculpatory." Clark concluded his argument by asking the court, once again, "to dismiss the charges."

Following a brief recess, the court denied the motion to dismiss the indictment. Although its ruling favored the Government, the court indicated that it was "extremely disturbed with the prosecution's handling of this case," and warned

that Dupuis' testimony contradicted such reference and thereby amounted to exculpatory evidence, and (3) the law required Rasmussen to give the defense a copy of Dupuis' grand jury testimony prior to trial. This was, in essence, the same argument Clark made in the absence of the jury on October 18 after receiving a copy of Dupuis' internal communication.

the prosecutors (Rasmussen and Donald Cochran, who occupied the second chair) that "if I find, later on during this trial, anything omitted that is exculpatory to the defendants, the motion will be granted at that time." Continuing, the court expressed its agreement with defense counsel that FBI 302s are discoverable under *Jencks*, and that the FBI may have attempted to skirt the requirements of *Jencks* by creating internal communications, instead of 302s, for the Fields interviews: "I do find some credibility [in defense counsel's position], not just some, I do believe that there is something to suggest that interoffice memos [i.e., FBI internal communications] are created so that materials cannot be produced to the defendant."[38]

After the denial of the motion to dismiss, Clark orally moved the court to declare a mistrial as an alternative remedy for the Government's misconduct. Joining in the motion, Johnson argued that statements in Dupuis' grand jury transcripts indicated that Rasmussen had "lied to" the grand jury: "So the grand jury, from the absolute beginning of the case, . . . the grand jury was misled, lied to, and wrongfully told [by Rasmussen] a falsehood about how the investigation

---

[38] The court did not use the word "*Jencks*" but it is obvious that the court was referring to *Jencks Act* statements. We draw this inference because, as we point out in part III infra, the Government could not avoid its obligations under Brady and Giglio to produce exculpatory and impeaching material by having the FBI agents substitute interoffice memos for their "raw notes" or their 302s.

34

began." Despite these assertions, the court denied the motion for a mistrial. Undeterred, Clark immediately asked the court to strike all of Fields' testimony. Without hearing from the Government, the court granted the motion and excluded Fields' testimony.[39] With this ruling in hand, the defendants requested a continuance. The court granted their request, stating that the trial would resume the following Monday, October 23. Defense counsel were concerned that, although the court had stricken Fields' testimony, subsequent prosecution witnesses – specifically, the JCSD employees who had run the ACJIS/NCIC checks for Fields – might be asked why they ran the checks, and they would say that Fields instructed them to do so. Accordingly, before court adjourned for the day, the defendants moved the court for a ruling that Fields' instructions to these employees would constitute "hearsay." The court granted their motion, and instructed Rasmussen to tell his witnesses not to testify on the stand to anything Fields may have said to them about running the checks; in the court's words, the witnesses were "not to say what Mr. Fields said to them."

During the continuance, on Thursday and Friday afternoons, October 19 and 20, Jordan filed the following motions, which Woodward adopted:

*Motion to Compel* the Government to produce "any notes, inter-office

---

[39] The court granted Clark's request without stating the basis for its decision.

memoranda, or other recordings of any type or sort of any and all interviews or conversations with [nineteen] individuals."

*Motion to Dismiss [the Indictment Due to the Government's] Failure to Timely Produce Exculpatory Evidence*.

*Motion to Dismiss [the Indictment] Due to Presentation of False Testimony to the Grand Jury and Cumulative Prosecutorial Misconduct* [based on the discovery violations previously cited to the court].

*Motion to Compel Production of Additional Documents or Things*, including "all grand jury testimony . . . [all] reports, in whatever form, of interviews conducted by the Office of the Alabama Attorney General . . . [c]omplete 302s of Government witnesses . . . [and] all audio, video or other recordings of witness statements."

The Government filed responses to these motions on Monday morning, before the trial resumed. The Government's position was essentially the position Rasmussen articulated earlier in responding to defense counsel's previous demands for what the defendants considered to be Brady, Giglio, or *Jencks Act* material. With respect to the materials it had produced – both before and during the trial – the Government contended that the production was timely; therefore, the motion to dismiss the indictment should be denied.

36

Court reconvened on Monday, October 23, at 8:45 a.m. In the absence of the jury, the court took up the defendants' several motions. After denying both motions to dismiss the indictment, the court turned to the *Motion to Compel*, and asked Rasmussen if he had turned over to the defense the items it had directed him to produce. He said that he had. Apparently satisfied with his response, the court did not rule on the motion.[40]

After addressing Jordan's motions to dismiss and *Motion to Compel*, the court turned to another motion Clark had filed on October 19: Jordan's *Motion for Order to Direct Response to Subpoena*, filed at 4:10 p.m. that day. This motion stated that on October 19, Jordan "served a subpoena on the Custodian of Records for the [FBI] requesting the production of notes, reports, summaries of interviews, statements, inter-office memoranda, or other documents or recordings of any type or sort of interviews of or conversations with [the nineteen] individuals . . . identified in this subpoena [which is attached to the motion]." The nineteen individuals were the same individuals named in Jordan's *Motion to Compel*, cited above, also filed on October 19 at 4:10 p.m. On October 20, the FBI, responded to Jordan's motion with a motion to quash, styled *Federal Bureau of Investigation's*

---

[40] The court did not realize until later in the day that Jordan had filed two motions to compel. We address in the text <u>infra</u> the court's treatment of Jordan's *Motion to Compel Production of Additional Documents or Things*.

*Motion to Quash Subpoena or Alternative Motion to Submit Materials In*

*Camera.*[41] The FBI's motion said, essentially, that Rule 17(h) of the Federal Rules

of Criminal Procedure rendered Jordan's subpoena unenforceable to the extent that

it sought witness statements.[42] Regarding the other material covered by the

subpoena, the motion stated that, at the court's request, the FBI would submit the

material to the court for en camera inspection.[43] Speaking to Assistant U.S.

Attorney Winfield Sinclair, the court said:

> I'm going to request that you make a list of what has not been
> produced . . . . I think that [it] is your burden to show the court what
> has already been produced . . . . You can leave, for en camera
> inspection, what has not been produced and I will be glad to look at it
> personally. And I need you to do that this morning.

Sinclair left the courtroom to prepare the list; he returned following the noon

recess.

Meanwhile, at 10:40 a.m., with the jury back in the courtroom, the trial

resumed. After the court instructed the jury to disregard Fields' testimony, the

---

[41] As was the case with the indictment and the other pleadings the Government filed, Craig Donsanto of the Department of Justice subscribed to the pleading. Also subscribing to the pleading was Assistant U. S. Attorney for the Northern District of Alabama Winfield Sinclair.

[42] Rule 17(h) states: "Statements made by witnesses or prospective witnesses may not be subpoenaed from the government or the defendant under this rule, but shall be subject to production only in accordance with the provisions of Rule 26.2."

[43] While the motion did not refer to Brady or Giglio, it is obvious that the only legitimate reason for giving the defendants the other material the subpoena covered would be that the material was exculpatory under Brady or impeaching under Giglio.

38

prosecution called (in succession) three JCSD employees to the stand.[44]  The first

was a deputy sheriff who obtained for Fields "a list of absentee voters."[45]  The

second and third witnesses were secretaries in the Bessemer office who, at Fields'

request, ran ACJIS/NCIC checks on names appearing on the absentee voter list.[46]

In examining these three witnesses, the prosecutors, in an effort to comply with the

court's earlier ruling and to keep them from uttering what Fields may have told

them, used leading questions.  The defense objected on thirteen occasions; every

objection was sustained.  When the prosecutor asked the deputy why he gave

Fields the voter list or asked the secretaries why they ran the ACJIS/NCIC checks,

defense counsel objected to the question as calling for hearsay.[47]  The prosecutor,

in turn, argued that the response would not constitute hearsay; rather, it would

simply explain why the witness performed the act in question.  On all but two

---

[44]  Rasmussen examined the first two witnesses; Cochran examined the third.

[45]  It does not appear from the record that the FBI had interviewed this witness prior to his appearance at trial.

[46]  Both witnesses were interviewed by the FBI.  The agents prepared 302s, which defense counsel were allowed to review and make notes of pursuant to the Government's July 20 *Discovery Notice*.  Copies of the 302s were given to the defense on the morning of October 19, before the witnesses took the stand.  The first secretary testified before the grand jury.  Defense counsel were allowed to review and make notes of the transcript of her testimony pursuant to the *Discovery Notice*.  They were given copies of the transcript when they received copies of the 302s.

[47] There were roughly twelve hearsay objections, of which ten were sustained.  In all, the defendants objected to the prosecutor's questions 25 times, and the court ruled with the defense 23 times.

39

occasions, the court sustained the hearsay objection; if, however, the witness answered the question, the court struck the response. When the prosecutor finished his direct examination of the third witness, the court declared the noon recess, at 12:15 p.m.

At 1:30 p.m., court reconvened, and, in the absence of jury, Clark moved the court to dismiss the indictment on the ground of prosecutorial misconduct: in examining the two secretaries, the prosecutor had engaged in "an intentional effort . . . to get that information [i.e., Fields' instructions to run the NCIC checks] that the court had specifically [excluded]." The court denied the motion.[48]

By this time, Sinclair had returned to the courtroom with the list the court had instructed him to prepare. He told the court that he had prepared a list that itemized "the complete FBI file." Of the items on the list, he identified one document the defense had not received. The court instructed him to give it to defense counsel, and he did so immediately.[49] He also informed the court that he was unable to determine whether the defense had all of the other documents on the

---

[48] In moving the court to dismiss the indictment, Clark asked alternatively for a mistrial. Assuming that the court was not going to grant a mistrial, he also asked the court to strike the testimony of the two secretaries. The court ruled on neither alternative motion.

[49] This document was an internal communication drafted on April 12, 2000, by FBI Agent Michael Casanova updating the Birmingham office of an investigation of a voter complaint filed by Jessie Burrel.

40

list. In response, the court suggested that he go over the list with defense counsel, to ensure that they had everything.

The trial thereafter resumed, and the second secretary took the stand for cross-examination. When she stepped down, the Government called a member of Jordan's law firm.[50] He produced a firm billing record which showed that Jordan and Fields had met on November 9. He was followed by Ray Edwards, the private investigator Woodward had hired, who was present at the Jordan-Fields November 9 meeting.[51] Next, a secretary in the JCSD Birmingham office testified that she ran NCIC checks on absentee voters.[52] After she testified, the court sent the jury home for the day.

With the jury excused, Clark asked the court to rule on his *Motion to Compel Production of Additional Documents or Things*, which he had filed on Friday, October 20. Among other materials, the motion sought the production of "any and all reports, in whatever form, of interviews conducted by the Office of the Alabama

---

[50] The record does not indicate whether the FBI interviewed this witness.

[51] The FBI interviewed Edwards, and he also testified before the grand jury. The transcript of his testimony and the 302s prepared following his interviews were made available to defense counsel pursuant to the *Discovery Notice*. Defense counsel received copies of the 302s and the grand jury transcript on the morning of November 19.

[52] The record does not indicate whether the FBI interviewed this witness. She testified before the grand jury. Defense counsel were given access to the transcript of her testimony pursuant to the *Discovery Notice*, and they received a copy of the transcript on the morning of November 19.

41

Attorney General including, but not limited to, any reports recorded on a document titled 'Interview Report Form.'" The court inquired of Rasmussen whether he had produced these items and the others listed in the motion, and he stated that every item had been turned over, although he was unsure with respect to a few reports of interviews conducted by the Alabama Attorney General's office. The court instructed Rasmussen to call the Attorney General's office and "make sure that they've turned over their investigative file."[53]

After a brief lull in the court-counsel colloquy, Sinclair returned to the courtroom and reported on his meeting with defense counsel. He informed the court that he and defense counsel tentatively agreed on the documents that had not yet been produced. These documents were photocopied, produced to the defense, and marked as court exhibits. Included among the documents were the following: three 302s;[54] handwritten notes of seventeen interviews;[55] three internal

---

[53] Though the court did not formally rule on the motion to compel, it effectively granted the relief Clark was seeking.

[54] Neither Sinclair nor defense counsel indicated whether the 302s concerned witnesses who would be testifying at the trial.

[55] The persons interviewed were Ken Rich, Terry Massey, Sam Robinson, Frank Richmond, Curtis Gordon, Ray Edwards, Sam Russell, Arthur Green, John Thomas, John Carden, Joy Ann Perry, Robert Brooks, Mike Hale, Jack Drake, Lou Brannon, Reginald Cochran, and Gary White. None of the notes indicates the identity of the agent who made them, but Dupuis probably drafted most of them.

communications;[56] a copy of an interoffice memorandum (from the Alabama

Attorney General's office) authored by Hunneyman on December 14, 1998; a July

14, 2000 memorandum written by Jefferson County Attorney Edwin Strickland to

the Jefferson County Commissioner's office regarding Woodward's request that

the County Commission pay the attorney's fees incurred in his defense in the

instant case; a February 15, 2000 credit report on Ray Edwards; and a document

dated October 19, 1999 acknowledging the FBI's receipt of property from Mike

Lannn of the ACJIC.

The next morning, Tuesday, October 24, Clark reminded the court that it had

instructed Rasmussen to call the Alabama Attorney General's office. Rasmussen

said that he had made several unsuccessful calls to Biggs and Hunneyman, and had

left a message on Biggs' answering machine. The court asked Rasmussen for

Biggs' telephone number, called the number, and wound up speaking to

Hunneyman. The court ordered Hunneyman to produce the items called for by

Jordan's *Motion to Compel Production of Additional Documents or Things*.


While the court was trying to reach Biggs, Rasmussen reported that he had

---

[56] Dupuis drafted the three internal communications, dated October 12 and November 8, 1999, and April 10, 2000. Dupuis's communications updated the Birmingham FBI office as to the status of the investigation into Woodward's alleged use of the NCIC.

given defense counsel three more transcripts of Dupuis' testimony before the grand jury (on December 1, 1999 and February 16 and May 17, 2000). The testimony had been transcribed the night before. He explained that his office had not asked the court reporter to transcribe the testimony earlier because the testimony only dealt with administrative matters. As Rasmussen put it, Dupuis' three appearances were "record returns. That's when we issued a subpoena and the agent comes in to the grand jury and says 'we're conducting this investigation, we issued a subpoena, and we got these records returned.' Typically, we don't transcribe those because they're administrative."[57] The court reporter for the grand jury happened to be present in the courtroom, and Clark took her aside and asked her if all of Dupuis' grand jury testimony had been transcribed. She said that Dupuis's appearance on June 21, 2000 (the date the grand jury returned the instant indictment) had not been transcribed. Clark informed the court of this, and Rasmussen said he would have the reporter prepare a transcript immediately. At this juncture, the court declared a brief recess.

When the proceedings resumed (still in the absence of the jury), Clark once

[57] The December 1 transcript consists of four pages of testimony. The February 16 transcript consists of eleven pages of testimony, in which Dupuis briefly answers some questions about the NCIC's operation and describes the allegations against Woodward. The May 17 transcript consists of a little over one page of testimony. Nothing in these transcripts relates to a witness interview.

44

again moved the court to dismiss the indictment on the ground of prosecutorial misconduct, to-wit: the Government's delay in producing the transcripts of Dupuis' grand jury testimony. He insisted that the these transcripts contained "exculpatory" evidence, although he pointed to nothing exculpatory in any of the transcripts.[58] He concluded his argument by accusing the Government of deliberately delaying its production of discoverable materials in an "attempt[] to provoke a mistrial."

Johnson, who joined in Clark's motion, elaborated on a theme he had been developing from the outset – that Woodward's indictment was the product of political shenanigans. Johnson drew the court's attention to Gary Carroll's September 15, 1999 memorandum to file (labeled "Work Product of the District Attorney's Office"), and then read an October 5, 1999 letter from District Attorney of the Seventh Judicial Circuit, Joseph D. Hubbard, to Bessemer District Attorney Russell, contending that, considered together, these exhibits revealed that

---

[58] Clark did point to page 10 of Dupuis' grand jury testimony of February 16, 2000, stating: "On page 10, a juror asked: 'Did the sheriff supply a list of names to his subordinates?' And [Dupuis] says he directed the subordinates to get a copy of the list and to run the checks. Contrary to Mr. Dupuis' claim that it was Mr. Jordan. It's exculpatory." We are at a loss to see how this is exculpatory. The notion that Rasmussen violated the teachings of Brady and Giglio, the discovery rule, Rule 16(a)(1)(C), or *Jencks* in failing to produce Dupuis' statement to the grand jury is patently frivolous.

45

"Woodward was indicted . . . because of grand jury misconduct."[59] The

memorandum Carroll (an investigator in Hubbard's office) wrote, referred to a

September 15, 1999, meeting he, Hubbard, and Michael Lann (the ACJIC

investigator) had at theVestavia Hills Police Department to discuss the Woodward

investigation. Reading from the memorandum, Johnson said: "Mr. Lann states,

categorically and unequivocally, Sheriff Woodward is not guilty of any crime." He

then read the following passage from Hubbard's October 5, 1999 letter to Russell:

> Dear Sam [Russell]:
>      I wanted to inform you that after investigating the facts
> surrounding this indictment [by the state grand jury] as fully and fairly
> as possible, I have concluded that it is not in a posture for successful
> prosecution at this time. Due to the present state of the evidence, as
> well as some exculpatory matters that have now come into my
> possession concerning the grand jury itself, I have decided to ask the
> court to enter a *nolle prosequi* concerning this indictment. This, of
> course, would not preclude future prosecution if needed.
>      In fact, I have met with U.S. Attorney Doug Jones several times
> over the course of my investigation and he suggested this indictment
> should be dismissed for a related federal investigation he is
> considering conducting. I concur this is the best move at this time.

After reading this letter, Johnson attempted to buttress his prosecutorial

misconduct claim by examining Dupuis. With the court's leave, he called Dupuis

to the stand and asked him whether Rasmussen was aware of the his internal

---

[59] Defense counsel had access to these two documents prior to trial pursuant to the Government's *Discovery Notice* of July 20, 2000.

46

communication of October 25, 1999. Dupuis said that Rasmussen knew about it. The court interrupted Johnson's questioning and asked Dupuis why he prepared an internal communication instead of a 302 following the October 25, 1999 Fields interview. Dupuis explained that, at the time of the interview, the FBI had not determined whether to use Fields as a "confidential informant," a "standard witness," or a "cooperating witness." Under Bureau policy, he said, each required a different report, inferring that, had the plan been to use Fields as a standard witness, he would have prepared a 302. Because, on October 25, 1999, Fields's role, if any, was undecided, his supervisor had him prepare an internal communication.

After Dupuis answered the court's questions, Johnson, by way of argument, compared Fields testimony before the grand jury with what Dupuis wrote in his internal communication of May 12, 2000 (digesting the information Fields gave him in a May 8, 2000 interview), and told the court that "they let Mr. Fields testify untruthfully [before the grand jury on June 21, 2000]."[60] With this, Johnson sat down, and Clark took over. Pursuing Johnson's line of inquiry, he asked Dupuis whether he had told Rasmussen about his internal communications. Dupuis' response was, "after I wrote them up, I told him I had documents." Clark concluded his questioning by having Dupuis acknowledge that, in his February 16,

---

[60] Johnson pointed to nothing in Fields' June 21 testimony that he considered untruthful.

47

2000 grand jury appearance, he testified to more than administrative matters. Rasmussen then asked Dupuis one question, "Did you view those [internal communications] as exculpatory?" Dupuis' response was "I don't know. I mean, I would have to think back. Yeah, I think – yeah, there were some things in there that certainly would have helped the defense." Rasmussen turned then to defense counsel's claims of prosecutorial misconduct.

Reduced to its essentials, Rasmussen's response was that none of the materials the Government had turned over during the trial contained exculpatory material; that he was not trying to provoke a mistrial; that the number of times Dupuis appeared before the grand jury was irrelevant; that he had no obligation to produce Dupuis' grand jury testimony because the Government never intended to call Dupuis, who was strictly a case agent, as a witness in its case in chief; and that the questions he put to the Government's witnesses – in an attempt to comply with the court's order precluding them from explaining why they obtained the absentee voter lists or why they ran the NCIC checks Fields wanted – had to be, of necessity, somewhat leading. When Rasmussen finished his presentation, the court declared a recess.

Following the recess, the court heard from Biggs and Hunneyman who gave defense counsel what was left of the Alabama Attorney General's file concerning

the Woodward matter. Included in the file were two interview report forms –

relating to the Alabama Ethics Commission's investigation of Woodward's use of

the NCIC – and some handwritten notes. The report forms were self explanatory,

but since the handwritten notes were not legible, Rasmussen had Biggs interpret

them. After that, Biggs and Hunneyman were excused. By this time, the court

reporter had transcribed Dupuis' grand jury testimony of June 21, 2000, and

Rasmussen furnished defense counsel and the court with copies. A fifteen minute

recess followed, so that they could read the transcript. Thereafter, the court

entertained the parties' comments.

Johnson said that the transcript showed that "[t]he grand jury was

completely misled by Mr. Dupuis and Mr. Rasmussen[, who examined Dupuis

before the grand jury that day,] in hiding from the grand jury all of the facts that

have been presented to [the court] in the last couple of days." Clark echoed

Johnson's view that the grand jury had been manipulated, raising four points.

First, Dupuis' testimony, which consumed thirty-four pages, was not about "the

production of documents." Second, Rasmussen erred in reading to the grand jury

only a part of 28 C.F.R. § 20 (a regulation governing the use of the NCIC); he

should have read the whole regulation. Third, Dupuis inaccurately reported what

Jefferson County District Attorney Barber "knew" about the NCIC checks. Fourth,

49

in telling a grand juror that the "usual procedure" in voter fraud cases was to refer the matter to the U.S. Attorney General, Rasmussen downplayed the authority of the "sheriff" to investigate the matter. After Jordan made these four points, the court interjected and suggested that Dupuis' statement – that "no criminal complaints were presented to either the Jefferson County District Attorney's office or the Bessemer District Attorney's office for any allegations of voter fraud" – was incorrect; complaints to one of those offices had been made.

Rasmussen's response to the court's comment was that when Dupuis mentioned the complaints, he was referring to the fact that Woodward's voter fraud task force presented no formal complaints to a District Attorney's office until after Woodward was indicted in this case. Rasmussen's reply to Clark's comments were, essentially, that the grand jury had not been misled, and that, while he was not required to do so, he informed the grand jury of Jordan's "basic defense."

Earlier, the court had instructed defense counsel to make a list of the documents they had received "for the first time" during the trial. Brett Bloomston, one of Johnson's law partners, read (on behalf of both defendants) the list, which consisted of twenty-four court exhibits and is reproduced in the margin,[61] into

---

[61] The twenty four court exhibits (Cx) identified by the defense are as follows:

Cx 1: An October 25, 1999 *Kastigar* immunity letter provided to Royce Fields. Defense counsel admitted on the record that they received this exhibit prior to trial.

50

Cx 2: Rasmussen's handwritten notes from an interview with Fields.

Cx 3: Posey's handwritten notes from the October 25, 1999 meeting with Fields.

*Cx 4: Dupuis' internal communication dated November 2, 1999 documenting information received from his interview with Fields on October 25, 1999.

Cx 5: Hunneyman's typed summary and Biggs' handwritten notes from the October 25, 1999 meeting with Fields.

Cx 9: A letter, dated October 20, 2000, from Rasmussen and Donsanto to defense attorneys Clark and Johnson stating that "[t]he cost of running an NCIC check for a criminal justice purpose is, as you have already stated, pennies. This is, however, because runs for criminal justice purposes are specifically funded." The cost for running checks for certain "non-criminal justice purposes . . . ranges from $2.00 a run to $24.00 a run."

Cx 16: An FBI memorandum dated April 12, 2000 from Agent Michael Casanova to the Birmingham office detailing information received from a Birmingham source "not in a position to testify" that an individual named Jessie Burrel is one of the individuals that went to Sheriff Woodward "before the elections and indicated to him she knew of some voting irregularities." These included a felon voting and forging of election documents. The source said that Burrel tried to bring this information to the FBI but her information was "discounted." The source also provided names of others who may have information on absentee ballot fraud.

Cx 17: A list of subpoenaed materials the FBI provided in response to the court's request during the hearing on the defense's October 19, 2000 *Motion for Order to Direct Response to Subpoena*.

Cx 18: This court exhibit encompasses numerous documents, including the following which the defendants claim they did not receive until after the trial commenced:

>    (A) 302 of Gary White, President of the Jefferson County Commission, dated September 8, 2000, claiming that Woodward never presented him with a bill for legal fees incurred facing the prosecution in this matter.

>    (B) 302 of Sergeant Kenneth Rich, dated December 23, 1999. Rich claims he observed Arnetta Sayers (Fields' secretary) running ACJIS/NCIC checks, and noticed voter registration lists on her desk; Rich also made a copy of the log being used to record the results. Rich was the deputy who leaked the fact that the NCIC checks were being done; it was his 302 to which the *Discovery Notice* referred

51

when it stated that certain summaries of interviews were not "made available due to fear of reprisal by one or [both] of the defendants."

(C)   302 of Connie Weeks of NCIC, dated May 3, 2000, in which Special Agent Dupuis noted that he requested Weeks to search all criminal histories run by the JCSD between November 1, 1998 and December 31, 1998.

(D)   Typed notes by Dupuis from an interview with Hunneyman on January 19, 2000, stating that Hunneyman provided Dupuis with two interoffice memorandums detailing the Alabama Attorney General's office's investigation into allegations of voter fraud made by the JCSD regarding the November 1998 general election for sheriff.

(E) Receipt of property record dated October 19, 1999, acknowledging the FBI's receipt of documents from Mike Lann of the ACJIC.

(F) Raw notes, prepared mostly by Dupuis, from interviews with Ken Rich, Terry Massey, Sam Robinson, Curtis Gordon, Ray Edwards, Sam Russell, Arthur Green, John Thomas, John Carden, Joy Ann Perry, Robert Brooks, Mike Hale, Judge William Wynn, Lou Brannon, Frank Richmond, Reginald Cochran, and Gary White.

(G) A series of "post-it" notes photocopied on one page.

(H) A credit check of Ray Edwards.

(I)   Four pages of handwritten notes written by an unknown author regarding voter fraud complaints.

(J) A memorandum dated July 14, 2000 to the Jefferson County Commission (JCC) from County Attorney Edwin A. Strickland recommending the JCC deny Woodward's request that the JCC pay Woodward's attorney fees arising from his defense to the criminal charges filed against him.

Cx 19: Includes three FBI internal communications drafted by Dupuis and two letters which appear to be Dupuis' typed updates to his file: (1) an internal communication dated October 12, 1999, from Dupuis to the Birmingham office requesting approval for a preliminary investigation into Sheriff Woodward's NCIC checks in the November 3, 1998 election; (2) an internal communication dated November 8, 1999, from Dupuis to the FBI Criminal Investigative Division advising the Bureau that an investigation has begun into allegations of abuse of the NCIC computer system by Sheriff Woodward; (3) an internal communication dated April 10, 2000, from Dupuis to the FBI Criminal

Investigative Division updating them as to the status of the Woodward investigation and implicating Albert Jordan in the alleged conspiracy; (4) a November 5, 1999 letter stating that U.S. Attorney Jones requested the FBI to initiate an investigation of Woodward's use of the NCIC; (5) an April 12, 2000 letter detailing the history of the Woodward investigation and noting an indictment against Woodward and Jordan is expected in mid-May of 2000.

*Cx 21: Dupuis' internal communication dated May 12, 2000 documenting information received from his interview with Fields on May 8, 2000.

Cx 22: A grand jury transcript of Dupuis' testimony on October 26, 1999.

Cx 23: A grand jury transcript of Dupuis' testimony on March 17, 2000.

Cx 24: A grand jury transcript of Dupuis' testimony on April 19, 2000.

Cx 25: A grand jury transcript of Dupuis' testimony on December 1, 1999.

Cx 26: A grand jury transcript of Dupuis' testimony on February 16, 2000.

Cx 27: A grand jury transcript of Dupuis' testimony on May 17, 2000.

Cx 28: A photocopy of Pub. L. No. 92-544, 86 Stat. 1109, 1115 (1972), discussing the salaries and expenses of the FBI, and other documents detailing NCIC search and cost statistics.

Cx 31: The rough notes, probably written by Fields and FBI Agent Thomas Mayhall, of their interview with Albert Jordan dated February 16, 2000.

Cx 33: A "post-it" note that Biggs made regarding a short discussion he had with Alabama Attorney General Pryor. This was the post-it note that Biggs was called to the stand to explain.

Cx 34: Transcript of an August 12, 1999 interview by Hunneyman with Charles Aldridge of the Alabama Ethics Commission. Aldridge discusses the Ethics Commission's investigation on Woodward, and also highlights his interaction with the Bessemer District Attorney's office, suggesting that the motives of the Bessemer District Attorney in indicting Woodward were possibly political.

Cx 35: Transcript of an August 23, 1999 interview by Jesse Seroyer, Jr. and John E. Brennan, agents in the Alabama Attorney General's office, with Aldridge regarding the Ethics Commission's investigation on Woodward. Aldridge comments on certain

the record.  Thereafter, Clark orally moved the court to dismiss the indictment.  He based his motion on the "cumulative effect" of

> the things that have occurred since [the commencement of the trial], including today, the production of the four transcripts of [Dupuis'] grand jury testimony, as well as other information, the testimony of Mr. Dupuis today, in which [Dupuis] acknowledged that he had told Mr. Rasmussen, over a year ago, of the existence of the so-called interoffice memoranda of Mr. Fields.

After acknowledging that "the government didn't have to [produce] all of this information," Clark suggested that the Government's intent in producing "thousands and thousands of documents" enabled it to withhold information that it was required by law to produce and rendered defense counsel's task in defending the case extremely difficult.

Johnson, joining in Clark's motion, said that "it all boils down . . . to three documents, [Dupuis' November 2, 1999 internal communication, Dupuis' May 12, 2000 internal communication, and Dupuis' June 21, 2000 grand jury transcript]."

---

interactions between the Ethics Commission and the District Attorney's office in Bessemer.

Cx 36: A log of the ACJIS criminal history checks conducted in November of 1998.  The log was prepared on October 23, 2000, and turned over to the defendants the next day.  Rasmussen had the log prepared because it was a "condensed version" of other ACJIS/NCIC logs already prepared, and made analysis "easier" for all viewers.

*Cx 39: A grand jury transcript of Dupuis' testimony on June 21, 2000.

*The defense identified court exhibits 4, 21, and 39 as the most important.  Besides the twenty-four identified court exhibits, the defense claims there are many more documents not marked as court exhibits which the prosecution failed to produce prior to trial.

First, endorsing Clark's specific criticisms of Rasmussen's handling of the grand jury (as reflected in the transcripts of Dupuis' testimony on June 21, 2000), Johnson urged the court to dismiss the indictment on the ground that the Government had abused the grand jury process.[62] Then, citing what he considered exculpatory evidence in Dupuis' internal communications of November 2, 1999, and May 12, 2000, Johnson contended the Government's delay in producing the documents materially prejudiced his client's defense.[63]

Rasmussen, in his response, treated the defense as advancing three discrete arguments: the court should dismiss the indictment on the grounds of (1) selective prosecution, to-wit: the Bessemer District Attorney's office, the U.S. Attorney's office for the Northern District of Alabama, and the Department of Justice, all Democrats, were after a Republican sheriff; (2) grand jury abuse; and (3) discovery abuse. As for the first and second grounds, he said, the defendants had made no showing. Turning to the third ground, Rasmussen argued that no abuse occurred. He insisted that none of the material handed over to the defense after the trial

---

[62] "Abuse of the grand jury process" is our expression. We use it because it reflects the gist of Johnson's argument.

[63] Johnson did not use the word "exculpatory" in referring to the November 2 and May 12 communications. Rather, we infer from his argument that, in his view, statements Dupuis made in the communications contradicted material portions of Fields' testimony on direct examination.

commenced constituted <u>Brady</u> or <u>Giglio</u> material in that it was exculpatory or impeaching. That being the case, none of the grand jury testimony, and none of the FBI 302s or any other documents, including Dupuis' internal communications, were discoverable under the *Jencks Act*.

As soon as counsel's arguments were finished, the court ruled from the bench and dismissed the indictment with prejudice for "Fifth [and] Sixth amendment" violations. The court explained why it took this step:

> The court has considered the prosecution, the manner in which it has proceeded, and I feel like it has prevented the defendants from preparing, even for cross-examination of the government's witnesses, because of the multitude of documents that have been given to them every night, or almost every night, in violation of repeated, not necessarily orders, but in violation of repeated representations by the government that they have produced everything to the defendants beginning three weeks ago.

The next day, October 25, the court entered a written order in conformance with its ruling from the bench. The order stated that "the cumulative effect of the prosecutorial misconduct has deprived the defendants of their rights guaranteed by the 5th and 6th amendments of the Constitution of the United States." On October 27, the Government took this appeal.

II.

Our jurisdiction to entertain this appeal is conferred by 18 U.S.C. § 3731.

56

That statute provides, in relevant part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment . . . as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.[64]

The defendants contend that the district court's order dismissing the indictment with prejudice is the functional equivalent of an acquittal of the charges lodged against them. We disagree.

In <u>United States v. Torkington</u>, 874 F.2d 1441(11th Cir. 1989), the district court dismissed the indictment with prejudice, pursuant to Rule 29 of the Federal Rules of Criminal Procedure,[65] at the beginning of the prosecution's presentation of evidence, based, as here, "on prosecutorial misconduct." <u>Id.</u> at 1445. The misconduct, according to the court, occurred when a Government witness referred to a matter the court had ruled inadmissible. The Government appealed under 18 U.S.C. § 3731, and the defendant took the same position the defendants take here:

---

[64] The Double Jeopardy Clause, which is contained in the Fifth Amendment, reads: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

[65] Rule 29 states in pertinent part:
> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment . . . after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

the Double Jeopardy Clause barred the appeal.  We disagreed.  We said that

"[r]egardless of how the district court styled its order . . . it is clear that the court

did not base its decision on the resolution of any of the factual elements necessary

for conviction." Id. at 1444.  The Double Jeopardy Clause therefore presented no

obstacle to the Government's right to prosecute the appeal.  Torkington is squarely

in point.  As in Torkington, the district court, here, dismissed the indictment early

in the prosecution's case, and "did not base its decision on the resolution of any of

the factual elements necessary for conviction."  We therefore consider the merits of

the Government's appeal.

III.

The district court dismissed the indictment in this case on the grounds that

the cumulative effect of prosecutorial misconduct had prevented defense counsel

from preparing their cross-examination of the Government's witnesses and thereby

infringed the defendants' rights under the Fifth and Sixth Amendments.   In other

words, the prosecutor's misconduct operated to deprive the defendants of their

Sixth Amendment right to the effective assistance of counsel,[66] and, at the same

_____

[66] The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions "the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI.  The Supreme Court has concluded that this right to the assistance of counsel includes the guarantee that their counsel will be effective in the discharge

58

time, their due process right to a fundamentally fair trial.[67]

The dismissal of an indictment on the ground of prosecutorial misconduct is a discretionary call;[68] we therefore review the court's action for abuse of discretion. See United States v. Pendergraft, 297 F.3d 1198 (11th Cir. 2002). A district court abuses its discretion if, in making the decision at issue, it applies the incorrect legal standard or makes findings of fact that are clearly erroneous. See In re Celotex Corp., 227 F.3d 1336, 1338 (11th Cir. 2000). Put in the context of this case, the question is whether the manner in which the prosecutor responded to the Government's discovery responsibilities under Rule 16(a), Brady, Giglio, and the *Jencks Act* – both before and after the trial began – could reasonably be labeled "misconduct," such that the court was justified in taking the action it did.

Before we assess the propriety of the prosecutor's conduct in this case, it is

---

of their duties. See McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441, 1449, 25 L. Ed. 2d 763 (1970).

[67] The Fifth Amendment to the U.S. Constitution provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has concluded that the Due Process Clause protects the right to fundamental fairness in criminal proceedings. See Patterson v. New York, 432 U.S. 197, 201-02, 97 S. Ct. 2319, 2322, 53 L. Ed. 2d 281 (1977).

[68] Although the district court has the discretion to dismiss an indictment on grounds of prosecutorial misconduct, see, e.g., United States v. Hollaway, 778 F.2d 653, 655 (11th Cir. 1985), it is well established that "dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." United States v. Accetturo, 858 F.2d 679, 681 (1988) (quoting United States v. Pabian, 704 F.2d 1533, 1536 (11th Cir. 1983)).

necessary to review what the law required the Government to reveal to the defendants – in terms of evidence and other materials – during the pretrial and trial stages of the prosecution.  We begin with the pretrial stage.

## A.

Our starting point is Rule 16(a) of the Federal Rules of Criminal Procedure, which spells out the materials the prosecution must produce on the defendant's request.[69]  While Rule 16(a) only applies to materials within the "possession, custody, or control of the government," courts have found that the "possession, custody, or control of the government" requirement includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor. See, e.g., United States v. Scruggs, 583 F.2d 238, 242 (5th Cir. 1978).[70]  Moreover, under the rule, the prosecution has a continuing duty to disclose any evidence that is subject to discovery or inspection. Fed. R. Crim. P. 16(c).[71]  On the other hand,

---

[69] See part I.B. supra.  Rule 16 sets forth the discovery obligations of the defendant as well as the government. The rule "is intended to prescribe the minimum amount of discovery to which the parties are entitled," and leaves intact a court's "discretion" to grant or deny the "broader" discovery requests of a criminal defendant. Notes of Advisory Committee on 1974 Amendments to Federal Rules of Criminal Procedure, Fed. R. Crim. P. Rule 16.

[70] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[71] Rule 16(c) states:
>    If, prior to or during trial, a party discovers additional evidence or

the government need not produce the materials unless there is a request by the defendant, see, e.g., United States v. Lambert, 580 F.2d 740, 745 (5th Cir. 1978). And even if there is a request, the government is not obligated to make copies of

---

material previously requested or ordered, which is subject to discovery or inspection under [Rule 16], such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material.

the items.[72]

Rule 16(a)(1)(C) addresses the discovery of documents and tangible objects.[73]  Under Rule 16(a)(1)(C), the government must permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, if the requested items (1) are material to the preparation of the defendant's defense;[74] (2) are intended for use by

[72] Nonetheless, the district court has the discretion to require the government to provide the defendant with copies of discovery material, especially where the defendant is indigent. United States v. Freedman, 688 F.2d 1364, 1366-67 (11th Cir. 1982).  The court's discretion, however, is not "unbridled."  Id. at 1366.  In Freedman, in holding that the district court had abused its discretion in ordering the government to go to a considerable expense in copying documents for the defense, we said this:

> Where the defendant has in no way been prohibited from inspecting the particular documents and cannot demonstrate an undue hardship from this availability, he should not be permitted to transfer the cost of his discovery request to the government especially where, as in the instant case, the defendants are not indigent.

Id. at 1366-67.

[73]  See note 12 supra.

[74] Although Rule 16(a)(1)(C) did not codify the Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. E. 2d 215 (1963), holding – which requires the government to provide the defendant evidence favorable to the accused – the rule's requirement that the government disclose documents "material to the preparation of the defendant's defense" indicates that the drafters of the rule recognized the government's Brady obligation.  See Notes of Advisory Committee on 1974 Amendments to Federal Rules of Criminal Procedure, Fed. R. Crim. P. Rule 16 ("Disclosure of documents and tangible objects which are 'material' to the preparation of the defense may be required under the rule of Brady v. Maryland.").  Some courts have held that the materiality standards under Rule 16 and Brady are the same.  See, e.g., United States v. Boffa, 513 F. Supp. 444, 499 (D. Del. 1980). Others have disagreed.  See, e.g., United States v. Eley, 335 F. Supp. 353, 358 (N.D. Ga. 1971) (The requirements of Rule 16 and Brady are not the same, since the latter constitutes a constitutional mandate and covers items that may be beyond

the government as evidence in chief at the trial;[75] or (3) were obtained from or

belong to the defendant.[76]

An item in the first category need not be disclosed unless the defendant

demonstrates that it is material to the preparation of his defense. A general

description of the item will not suffice; neither will a conclusory argument that the

requested item is material to the defense. See United States v. Carrasquillo-Plaza,

873 F.2d 10, 12-13 (1st Cir. 1989); United States v. Cadet, 727 F.2d 1453, 1466

(9th Cir. 1984). Rather, the defendant must make a specific request for the item

together with an explanation of how it will be "helpful to the defense." See, e.g.,

United States v. Marshall, 132 F.3d 63, 67-68 (D.C. Cir. 1998) ("helpful" means

relevant to preparation of the defense and not necessarily exculpatory); United

States v. Olano, 62 F.3d 1180, 1203 (9th Cir. 1995). As the Fifth Circuit put it in

the reach of the rule.)

[75] The phrase "evidence in chief" has been interpreted to mean proof presented in the government's case in chief, and not to evidence used only for impeachment, see, e.g., United States v. Lambert, 580 F.2d at 746, or rebuttal. See, e.g., United States v. Givens, 767 F.2d 574, 582-83 (9th Cir. 1985). On the other hand, documents are considered part of the evidence in chief if they are marked and offered into evidence by the government or relied on or referred to in any way by the government's witness. See United States v. Countryside Farms Inc., 428 F. Supp. 1150, 1154 (D.C. Utah 1977).

[76] The items in the second and third categories were added to the rule in 1974 to make clear that items which the government intends to introduce at trial or which belong to the defendant are material to the defense, and should be produced before trial. Notes of Advisory Committee on 1974 Amendments to Federal Rules of Criminal Procedure, Fed. R. Crim. P. Rule 16.

United States v. Buckley, 586 F.2d 498, 506 (5th Cir. 1978) (quoting United States

v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975)), the defendant must "show" "more

than that the [item] bears some abstract logical relationship to the issues in the

case. . . . There must be some indication that the pretrial disclosure of the [item]

would . . . enable[] the defendant significantly to alter the quantum of proof in his

favor."

The discovery afforded by Rule 16(a)(1)(C) is limited by Rules 16(a)(2) and

(3).[77] Rule 16(a)(2) exempts from disclosure "reports, memoranda, or other

internal government documents made by the attorney for the government or any

other government agent investigating or prosecuting the case," and "statements

made by government witnesses or prospective government witnesses." Rule

16(a)(3) exempts the discovery of statements of persons who have testified before

a grand jury. The *Jencks Act*, of course, mandates that a statement by a prospective

prosecution witness to an investigative agent or the grand jury must be provided to

the defense after the witness has testified on direct examination.[78]

In addition to the government's discovery obligations under Rule 16(a), the

---

[77] See note 17 supra.

[78] In some cases, if the prosecutor trusts defense counsel and, moreover, is satisfied that an earlier production of a *Jencks* statement will not lead to mischief, such as witness intimidation, the prosecutor may turn it over before the witness is to testify. Indeed, it is customary in many jurisdictions for the government to produce *Jencks* materials prior to trial.

government must also honor the defendant's constitutional rights, particularly the

due process right Brady v. Maryland established.[79]  Brady requires the prosecutor

to turn over to the defense evidence that is favorable to the accused, even though it

is not subject to discovery under Rule 16(a), since, eventually, such evidence may

"undermine[] the confidence in the outcome of the trial." United States v. Newton,

44 F.3d 913, 918 (11th Cir. 1995) (quoting United States v. Bagley, 473 U.S. 667,

678, 105 S.Ct. 3375, 3381, 87 L. Ed. 2d 481 (1985)).  The defendant's right to the

disclosure of favorable evidence, however, does not "create a broad,

constitutionally required right of discovery." Bagley, 473 U.S. at 675 n.7, 105 S.

Ct. at 3380 n.7.[80]  Indeed, a "defendant's right to discover exculpatory evidence

does not include the unsupervised right to search through the [government's]

---

[79] The typical Brady claim comes to light following the defendant's conviction, with the discovery  "of information which had been known to the prosecution but unknown to the defense." See United States v. Kubiak, 704 F.2d 1545, 1549 (11th Cir. 1983) (quoting United States v. Agurs, 437 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. E. 2d 342 (1976)).  In the case at hand, however, the defendants' Brady claims involve material that was produced both before and during the defendants' trial.  In such a scenario, because the trial has just begun, the determination of prejudice is inherently problematical.

[80] The Supreme Court in Bagley explained that:
> An interpretation of Brady to create a broad, constitutionally
> required right of discovery 'would entirely alter the character and
> balance of our present systems of criminal justice.'  Furthermore, a
> rule that the prosecutor commits error by any failure to disclose
> evidence favorable to the accused, no matter how insignificant,
> would impose an impossible burden on the prosecutor.

Bagley, 473 U.S. at 675 n.7, 105 S. Ct. at 3380 n.7 (quoting Giles v. Maryland, 386 U.S. 66, 117, 87 S. Ct. 793, 818, 17 L. Ed. 2d 737 (1967) (dissenting opinion)).

files," Pennsylvania v. Ritchie, 480 U.S. 39, 59, 107 S. Ct. 989, 1002, 94 L. E. 2d 40 (1987), nor does the right require the prosecution to deliver its entire file to the defense. See Agurs, 437 U.S. at 109, 96 S. Ct. at 2400. Rather, Brady obligates the government to disclose only favorable evidence that is "material." The "touchstone of materiality is a 'reasonable probability' of a different result." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. E. 2d 490 (1995). Accordingly, under Brady, the government need only disclose during pretrial discovery (or later, at the trial) evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings. Not infrequently, what constitutes Brady material is fairly debatable. In such cases, the prosecutor should mark the material as a court exhibit and submit it to the court for en camera inspection. See Buckley, 586 F.2d at 506 (citing Agurs, 437 U.S. at 106, 96 S. Ct. at 2399).[81]

---

[81] Where, as here, the defendant only makes a general request for exculpatory material under Brady, the government decides which information must be disclosed. Ritchie, 480 U.S. at 59, 107 S. Ct. at 1002 (footnote omitted). "Unless the defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." Id. If the defendant is aware of specific information contained in the government's file, "he is free to request it directly from the court, and argue in favor of its materiality." Id. However, mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove "materiality." See, e.g., United States v. Ramos, 27 F.3d 65, 71 (3d Cir. 1994) (mere speculation that agents rough notes contained Brady evidence insufficient); United States v. Williams-Davis, 90 F.3d 490, 513 (D.C. Cir. 1996); United States v. Michaels, 796 F.2d 1112, 1116 (9th Cir. 1986). The defendant must show that there is a reasonable probability the evidence could affect the outcome of the trial. See Baxter v. Thomas, 45 F.3d 1501, 1507 (11th Cir. 1994).

B.

Once the trial begins, the government must produce the *Jencks Act*
statements of a witness when the witness is tendered for cross-examination.[82]  As
mentioned, "statement," under the Act, is a term of art; "Congress[, in enacting the
*Jencks* legislation,] was concerned that only those statements which [can] properly
be called the witness' own words should be made available to the defense . . . .  It
[is] important that the statement[s reflect] fully and without distortion what had
been said." Palermo v. United States, 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.
Ed. 2d 1287 (1959).  Consequently, an interviewer's raw notes, and anything
prepared from those notes (such as an FBI 302), are not *Jencks Act* statements of
the witness unless they are substantially verbatim and were contemporaneously
recorded, or were signed or otherwise ratified by the witness. See United States v.
Delgado, 56 F.3d 1357, 1364 (11th Cir. 1995).  On the other hand, if the agent is
called as a witness, these statements – depending on the scope of the agent's
testimony on direct examination – may constitute *Jencks* material. See United

_____

Additionally, we observe that a general request for "all" Brady material, like the one by Jordan in this case, does not help the prosecutor determine which information in the government's possession might constitute Brady evidence.  Combined with the fact that "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete," Agurs, 427 U.S. at 108, 96 S. Ct. at 2399, a general request for all Brady evidence places an onerous, if not impossible, burden on the prosecutor to identify correctly all "material" items.

[82] See note 28 supra.

67

States v. Saget, 991 F.2d 702, 710 (11th Cir. 1993).

In addition to producing *Jencks Act* statements, the prosecutor must continue to comply with Brady's demands once the trial begins. Accordingly, the prosecutor must turn over any newly discovered items that materially favor the defense, see High v. Head, 209 F.3d 1257, 1265 n.8 (11th Cir. 2000) (prosecutor has "ongoing" duty to disclose exculpatory evidence), as well as any impeachment evidence that is likely to cast doubt on the reliability of a witness whose testimony "may well be determinative of guilt or innocence." Bagley, 473 U.S. at 676-77, 105 S.Ct. at 3380-81 (quoting Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L. Ed. 2d 104 (1972)). See United States v. Bueno-Sierra, 99 F.3d 375, 380 (11th Cir. 1998). Impeachment evidence should be disclosed in time to permit defense counsel to use it effectively in cross-examining the witness. See United States v. Bueno-Sierra, 99 F.3d at 379-80; United States v. Higgs, 713 F.2d 39, 43-44 (3d Cir. 1983).

With the foregoing principles in mind, we evaluate the prosecutor's compliance with the Government's discovery obligations in this case.

C.

i.

Part I.B., supra, describes in considerable detail the discovery the Government provided the defense prior to trial – beginning with the *Discovery Notice* it served on the defendants, on July 20, 2000, immediately following their arraignment. The *Discovery Notice* gave defense counsel access to far more evidence and other material than Rule 16(a) required. Among other non-discoverable items, they were given access to transcripts of grand jury testimony and summaries of witness interviews, including FBI 302s.[83] Because the Government produced the summaries of interviews and 302s, defense counsel insisted on the production of the agents' and other investigators' "raw notes," implying that the Government had waived its right, under Rule 16(a)(2), to withhold those items. In addition, they demanded access to everything the Government and the Alabama Attorney General's office possessed that related to their investigation of the case. When the Government resisted, defense counsel sought court orders compelling the Government to produce these materials. The magistrate judge, concluding that counsel's requests had no support in the law, denied their motions, and the district court summarily affirmed his decisions.

---

[83] As the Government's July 31, 2000 response to Jordan's *Request for Disclosure* correctly stated, "the government's *Discovery Notice* proffers practically all the materials and information gathered and developed in the investigtation . . . [and] provides all the material the defen[se] is entitled to under the law." The Government reiterated this in its August 8 response to Jordan's *Motion to Compel Specific Production*: "The defendants have been given practically all the evidence gathered in this investigation."

The defendants complain that the Government's discovery was so voluminous that it hindered their pretrial preparation. The discovery was indeed voluminous – because the Government gave the defense access to far more information and materials than the law required. The defendants could hardly complain about that. If they had insufficient time to sort things out, they should have asked for a continuance.[84]

The defendants also contend that the Government attempted to avoid its Brady obligation by requiring them to search the discovered materials for exculpatory material. Their request for Brady material was nothing more than a general request for favorable information. As far as we can tell, the defendants never told Rasmussen or anyone else on the prosecution team what their "defense" would be. As Rasmussen said to the magistrate judge at the September 5th hearing on the defendants' motions to compel further discovery, "I don't know what [Clark's] theories are. I don't think there is a defense in this case. And I don't know exactly what he's going to say or not say."

The defendants may have had a defense, but, given the court's dismissal of

---

[84] As noted supra, the court gave the defendants an eight-day continuance – from October 2 to October 10, and there is nothing in the record which would lead us to believe that the court would not have granted an additional continuance had they asked for one. See also 18 U.S.C. § 3500(c) ("Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required").

the indictment, there was no need to disclose it. Whatever their defense may have been, the defendants apparently needed far more help than the Government's Rule 16(a) discovery provided; hence, their blanket demands for everything the Government, the Alabama Attorney General's office, and anyone else who had investigated the case may have uncovered. They were obviously searching for anything that might persuade a jury to acquit.[85] In sum, the defendants' discovery requests went far beyond what the law, as we have expounded it, requires. As the Supreme Court observed, in reversing the D.C. Circuit in Agurs:

> The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in Brady. For a jury's appraisal of a case 'might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.
> Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much.

427 U.S. at 108-09, 96 S. Ct. at 2400 (footnotes omitted). We cannot tell from what the district court stated on the record on October 24, or what it wrote in its order the next day, whether the court thought the dismissal of the indictment was

---

[85] At the September 5 hearing before the magistrate judge, Rasmussen expressed this thought when he told the court that the defendants were on a "fishing expedition."

warranted because of the manner in which the prosecution discharged its pretrial discovery obligations. If the court believed that the prosecution was derelict in discharging those obligations, the belief was unfounded.

ii.

At trial, the items the prosecutor failed to produce – the items that appear to have concerned the court the most – fell into two categories: *Jencks Act* statements and <u>Brady</u> materials – more specifically, materials that, under <u>Giglio,</u> amounted to "impeaching evidence." We discuss these categories in order.

a.

Government agents' reports of witness interviews and summaries of those interviews are not *Jencks Act* statements unless they are (1) substantially verbatim, contemporaneously recorded transcripts, or (2) signed or otherwise adopted by the witness. <u>See</u> <u>United States v. Delgado</u>, 56 F.3d 1357, 1364 (11th Cir. 1995). The statements at issue – those the court required Rasmussen to produce (namely, the raw notes, summaries of interviews, FBI 302s and internal communications, and other writings made by investigating agents, assistant U.S. attorneys, and personnel in the Alabama Attorney General's office) – were, according to defense counsel

and the court, Fields' *Jencks Act* statements. We fail to see how any of the statements qualify under either of the *Jencks Act* definitions.

As used in the *Jencks Act*, "substantially verbatim" means using the nearly exact wording or phrasing the witness uttered during the interview; if only some of the exact wording is used, it is not *Jencks* material. See United States v. Cole, 634 F.2d 866, 867 (5th Cir. Jan. 1981) ("[A]lthough the notes may have contained phrases or isolated sentences identical to the language used by the witness, they were not a 'substantially verbatim report' of the interview."). Whether a 302, raw notes, or other government document contains sufficiently extensive verbatim recitation to come within the Act is a matter of fact to be decided by the trial court. See United States v. Loyd, 743 F.2d 1555, 1566 (11th Cir. 1984). In this case, the defense proffered nothing to show the statements were verbatim transcripts, see Delgado, 56 F.3d at 1364, nor did the court ascertain the sufficiency of the recitation. Moreover, our review of the statements indicates that none are probably sufficiently verbatim. Regardless of our review, however, it is clear that the court could not have properly dismissed the indictment based on the fact that the Government failed to produce what obviously constituted Fields' "substantially verbatim" *Jencks Act* statements.

Nor could the court have based its dismissal on the Government's failure to

produce Fields' "adopted" *Jencks Act* statements.  If, after reading the statements,

the court thought Fields may have "adopted" them as his own, the court should

have held an evidentiary hearing to determine if Fields had in fact done so. See

Loyd, 743 F.2d at 1566.  Fields was present in the courtroom; it would have been a

simply matter to show him the statements and ask him whether he had adopted

them.  But no hearing was held.   Furthermore, defense counsel provided no

evidence that Fields adopted or approved the reports or that any of the government

agents "read back his notes or asked [Fields] to confirm their accuracy." Delgado,

56 F.3d at 1364.[86]

That the district court misapplied the *Jencks Act*, however, does not end our

inquiry into whether the prosecutor engaged in misconduct justifying the dismissal of the

indictment.  We must decide whether he withheld exculpatory or impeaching evidence,

in derogation of his duties under Brady and Giglio, such that he could be charged with

prosecutorial misconduct sufficient to warrant the dismissal of the indictment.

---

[86] In our view, no reasonably competent prosecutor could have anticipated the district court's sudden reversal of its decision affirming the magistrate judge's denial of the defendants' repeated discovery demands for the investigators' raw notes, interview summaries, and internal agency reports (effectively the Government's and the Alabama Attorney General's "entire file").  The court's about-face put the prosecutor in an untenable position; how was he to produce instantaneously documents he had no reason to suspect would be discoverable at the conclusion of Fields' direct examination?  Under the circumstances, the prosecutor behaved quite admirably, with the respect the court was entitled to receive from one of its officers.

b.

It becomes evident from a reading of the record that, after the trial began, defense counsel and the court sometimes referred to the documents the prosecution produced, or was instructed to produce, as *Jencks Act* material; sometimes they labeled them <u>Brady</u> or <u>Giglio</u> material. We have examined the materials marked as court exhibits and find that none constitutes <u>Brady</u> material in the sense that the material is exculpatory. The question thus becomes whether any of the material was "impeaching" under <u>Giglio</u>. To answer the question, we focus on Assistant Sheriff Fields' testimony on direct examination and the controversy it engendered.[87]

Before defense counsel commenced Fields' cross-examination, they had the transcripts of his grand jury testimony. They also knew that he had appeared before the grand jury under a grant of immunity. Early in the cross-examination, Fields revealed that prior to his first grand jury appearance, he had been interviewed by Dupuis, Posey, Biggs, and Hunneyman. At this point, counsel demanded the interviewers' raw notes because, as Clark put it, "[a] lot of what he said [to the interviewers], we would contend, at least has some exculpatory information in it

---

[87] We focus on Fields' direct examination because there is no claim that the prosecutor withheld any evidence that would have materially impeached any of the other witness who testified.

75

and we would be entitled to it."[88]  Of course, counsel had not seen the notes (or the

summaries or reports made from the notes), so counsel was purely speculating.

Nonetheless, the district court ordered the prosecutor to produce the notes.

Rasmussen produced those that were available, and the summaries and internal FBI

communications prepared from the notes that were thereafter discarded.[89]  Later, the

prosecutor obtained and gave the defense similar documents maintained in the

Alabama Attorney General's office.  According to defense counsel, this evidence

impeached Fields' testimony.  For example, Dupuis' internal communication of

November 2, 1999 contained "details" the prosecutor failed to bring out on direct

examination.  These details contradicted Fields' testimony as follows: (1) contrary

to Fields' testimony on direct, he obtained for Jordan an "absentee voter application

---

[88]  Earlier, in his pretrial discovery requests, Clark made the same claims in support of his *Motion . . . to Compel Production of Witness Statements and Grand Jury Testimony*.  There he demanded that the Government produce "all of such statements and [grand jury] testimony on the [] grounds all of said statements and grand jury testimony are to some degree exculpatory."

[89]  During the intermittent court/counsel interchanges concerning whether the interviewers' raw notes, summaries of interviews, and internal communications constituted *Jencks* material, the court accepted as credible defense counsel's allegation that, in an effort to avoid disclosure of Brady and Giglio material, the Government had Dupuis, and perhaps other FBI agents, prepare "internal communications" and other interoffice memoranda instead of 302s. The court apparently overlooked the fact that it matters not whether exculpatory or impeaching material is in the form of raw notes, a 302, or an interoffice communication: if the document contains exculpatory or impeaching information, the prosecution is duty bound to disclose it. Nothing in the record before us indicates that the Government – in particular, the prosecutor's office – believed that its duty to disclose Brady or Giglio material depended on whether the material existed in the form of raw notes or a 302, as opposed to an interoffice memorandum or other internal communication.

list" (not an "absentee voter list"); (2) Fields and Jordan met on November 9, not November 17 or 18 as Fields told Dupuis; (3) Fields told Dupuis that Woodward's voter fraud investigation began on November 5, not on November 19; (4) Fields failed to reveal on direct examination (because he was not asked) that he had heard a rumor that Woodward was going to replace him after the election; and (5) Fields testified incorrectly that Jordan instructed him to use the NCIC.

We do not believe the omission of such details amounted to the withholding of impeaching evidence, such that Giglio required the prosecutor to disclose it when Fields took the stand. The first point is frivolous – there can be no doubt that Fields retreived a list for Jordan with the names of those who intended to, or did, vote absentee. The second point is likewise frivolous: in his opening statement to the jury, Clark said that Fields and Jordan had met on November 9. Regarding the third point, we note that defense counsel knew in advance of trial that, as early as November 5, Woodward's office was investigating voter fraud. The fourth point is frivolous; in his grand jury testimony (a transcript of which defense counsel possessed), Fields said that his job was on "thin ice"; Woodward contemplated replacing him after the election. Also frivolous is the fifth point because, contrary to counsel's representation to the court, Fields did not testify that Jordan instructed him to use the NCIC.

The withholding of information such as the above provided the basis for defense counsel's allegation of prosecutorial misconduct and the defendants' motions to dismiss the indictment.  Defense counsel contend that Dupuis' grand jury testimony materially contradicted what Fields said on direct examination.  We have examined Dupuis testimony and find nothing that could reasonably be used to impeach Fields' testimony.   Similarly, we find no <u>Giglio</u> material in any of the other materials the prosecutor turned over at trial.   The same is true with respect to the FBI files Sinclair produced in response to Jordan's subpoena.

IV.

We have concluded that the district court misapplied the <u>Brady</u> and <u>Giglio</u> rules as well as the *Jencks Act*.  The court therefore abused its discretion to the extent that it struck Fields' testimony,[90] and then dismissed the indictment on the

---

[90] Implicit in the court's decision to strike Fields' testimony is the notion that the Government's failure to disclose the allegedly impeaching materials – Dupuis' internal communications and his grand jury testimony, and the notes and summaries made by those who interviewed Fields before he appeared before the grand jury – deprived counsel of <u>Giglio</u> impeaching material so late in the game that counsel could not prepare to cross-examine Fields effectively.  Since it was apparent that none of these materials constituted Fields' *Jencks Act* statements, the only way in which defense counsel could have used the materials would be to ask Fields whether, at a given point in time, he told Dupuis (or the other persons who interviewed him) this or that.  If Fields denied telling Dupuis this or that, the defense could call Dupuis as a witness and attempt to elicit the inconsistent (and presumably impeaching) statement.  Our examination of the material defense counsel and the court deemed impeaching discloses that any inconsistencies they revealed – between what Fields said on direct examination and what he told Dupuis (and the others) – were minor, and clearly were not impeaching under the <u>Giglio</u> standard.  Finally, regarding the fact that the materials contained information that Fields did not

78

ground that the prosecutor grievously mishandled the Government's discovery obligations created by those cases and the statute. There remains, however, one other possible basis for the court's actions. Shortly before it dismissed the case, the court indicated that the prosecutor had engaged in highly inappropriate conduct in examining the JCSD witnesses who took the stand after Fields' stepped down. The misconduct consisted of asking leading questions and eliciting hearsay, to-wit: what Fields said to them that caused them to run the ACJIS/NCIC checks. We find no misconduct, for several reasons.

First, the court's ruling that the witnesses could not say what Fields told them was erroneous because Fields made the challenged statements as a member of the conspiracy alleged in Count One of the indictment, and he made them during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). Moreover, what Fields said to the witnesses – in response to which they ran the checks – was admissible to show the witnesses' state of mind. See Fed. R. Evid. 801(c); 2 John W. Strong, McCormick on Evidence § 249 (5th ed. 1999); 6 John Henry Wigmore, Wigmore on Evidence § 1789, at 214 (Chadbourn rev. 1976).[91] In addition, our review of the

---

disclose on direct examination (because he was not asked about them), we are unaware of any legal authority which holds that the non-disclosure of information not elicited on direct examination somehow warrants the striking of the witness' testimony.

[91] Once the court ruled, the prosecutor, as an officer of the court, was bound to act accordingly.

prosecutor's questions – to which defense counsel objected as leading (as well as calling for hearsay) – convinces us that most of the questions were not leading; accordingly, the objections should have been overruled. Finally, even if the questions were somewhat leading or elicited hearsay, we are satisfied that the prosecutor, forced to tiptoe through a veritable minefield, was doing his best to keep the witness from uttering anything Fields had said. We therefore find nothing in the manner in which the prosecutor handled his direct examination of the JCSD employees that reasonably could be labeled prosecutorial misconduct.

## V.

In conclusion, because the bases for the district court's dispositive action – the dismissal of the indictment with prejudice – have no foundation in the law, such action constituted an abuse of discretion. The judgment of the district court is accordingly VACATED, the indictment is REINSTATED, and the case is REMANDED for further proceedings.

SO ORDERED.